UNITED STATES of America

v.

**Bernarr ZOVLUCK, Defendant.**

**No. 75 Cr. 168–CLB.**

United States District Court,
S. D. New York.

Jan. 19, 1977.

---

---

Robert B. Fiske, Jr., U. S. Atty., Southern District of New York by Audrey Strauss, Asst. U. S. Atty., New York City, for plaintiff.

Jerold C. Weissfeld, New York City, for defendant.

## FINDINGS AND CONCLUSIONS

BRIEANT, District Judge.

On February 19, 1975 defendant Bernarr Zovluck was indicted for fourteen counts of mail fraud, and attempted mail fraud involving the use of false names on applications to the offices of credit card agencies, banks and other commercial establishments, as well as one count of making a false statement in an application for a personal installment loan to a branch of Bankers Trust Company.

Following the indictment, Zovluck and his court-appointed attorney moved to suppress several confessions and admissions made by defendant as well as certain evidence which had been seized from his office. At the suppression hearing and related pre-trial proceedings, Zovluck insisted on appearing pro se.[1] After several such appearances before me in connection with the suppression hearing, I became concerned that defendant might not be competent to stand trial. I therefore directed that Zovluck be sent to the Federal Medical Center at Springfield, Missouri for a determination as to his mental competency to understand the proceedings against him. An evidentiary hearing has been held before me pursuant to 18 U.S.C. § 4244.[2]

Zovluck first went to Springfield on February 12, 1976. After a stay of one month, he was found by the staff to be incompetent to stand trial and was remanded to this Court on March 24, 1976 for further proceedings. The report of incompetency included evaluation by two staff psychiatrists at Springfield, both of whom reached no decision, deferring rather to a determination by staff review. The staff examination, conducted before ten professionals, produced a finding of incompetency.

On April 14, 1976, at the first hearing following receipt of the Springfield report, the Government moved to have Zovluck returned to Springfield for further study and evaluation. The Government based this request on the psychiatrists' statements

---

1. Although Zovluck, from time to time, insisted on appearing pro se, he has at all times been assisted by or represented by a highly capable Court-appointed attorney, Jerold C. Weissfeld, Esq. Mr. Weissfeld has been present at all of the proceedings in this action.

2. ". . . [T]he court shall hold a hearing, upon due notice, at which evidence as to the mental condition of the accused may be submitted, including that of the reporting psychiatrist, and make a finding with respect thereto."

that additional information, received after the examination, might have rendered their conclusion inaccurate. Dr. Jack Eardley, Chief of Psychiatry at Springfield, testified before me to this effect. He stated that:

"in view of the information that was presented here this winter [transcript of the suppression hearings] I have reservations about our initial impression . . . . So there are inconsistencies." (Transcript, April 14, 1976, p. 34).

The doctor testified that a broader study, involving more doctors and psychologists, and based on a full range of tests and evaluations would produce a more accurate result. On April 14, 1976 I ordered defendant returned to Springfield for further study and evaluation. He arrived there on May 7, 1976.

On September 15, 1976 the Court received a letter from Dr. Eardley declaring the defendant competent to stand trial. Attached to this letter were reports from Drs. Collier, Fain, Varhely and Eardley, as well as Mr. Kinney, a psychologist, all members of the Springfield staff, and from Dr. Emasue Snow, a consulting psychiatrist. These reports, collectively, support the conclusion that defendant is competent to stand trial, and was in fact, malingering in an effort to avoid going to trial.

At the competency hearing, which reconvened on October 7, 1976, the Government offered testimony from Drs. Snow, Varhely and Eardley, each of whom found Zovluck to be malingering and competent to stand trial. After two days of hearings, a continuance was granted to allow the defendant to present testimony from a psychiatrist of his choosing. On December 6 and again on December 16, 1976 this Court heard testimony from Dr. Augustus Kinzel, a distinguished psychiatrist engaged in private practice in New York City and a Lecturer on Legal Psychiatry at Columbia University. Dr. Kinzel testified, pursuant to two reports submitted to this Court, that Zovluck is incompetent to stand trial and is not malingering. The hearing was completed on December 16, 1976.

The legal test of a defendant's competency to stand trial is found in *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960):

"(W)hether he has sufficient present ability to consult with his lawyer with a *reasonable degree* of rational understanding—and whether he has a rational as well as factual understanding of the proceedings." (Emphasis added).

See also *Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). It is noteworthy that incompetency to stand trial is not defined in terms of mental illness. A defendant can be competent to stand trial despite being mentally ill. Similarly, a defendant can be found incompetent to stand trial without being mentally ill. *United States v. Adams,* 297 F.Supp. 596 (S.D.N.Y.1969). Competence to stand trial is not solely a medical concept. The inquiry is, not whether defendant is sick, but whether he can understand the charges against him and cooperate with his attorney in making his defense. It is for this reason that the psychiatric evaluations serve only as recommendations in making the final judgment.

In *United States v. Mercado,* 469 F.2d 1148 (2d Cir. 1972), this Circuit applied the test of *Dusky, supra,* in affirming a finding of competence based on a showing that defendant understood the charges against him and was capable of cooperating in his defense by such means as providing an account of the facts and providing the names of necessary witnesses. This finding, of course, is not synonymous with a clean bill of mental health.

The burden of proving that defendant is competent to stand trial is on the Government, which must prove its contention by a preponderance of the evidence. *United States ex rel. Bornholdt v. Ternullo,* 402 F.Supp. 374, 377 (S.D.N.Y.1975), and cases therein cited. This allocation of the burden is reasonable in view of the established rule that trial of an accused while incompetent is a violation of the accused's constitutional rights. *United States ex rel.*

*Daniels v. Johnston,* 328 F.Supp. 100, 110 (S.D.N.Y.1971); *United States v. Knohl,* 379 F.2d 427, 434 (2d Cir.), *cert. denied,* 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967). Thus, if the evidence presented by both the defendant and the Government results in an irreconcilable contradiction, the defendant must be given the benefit of the doubt and found to be incompetent.

We turn now to a review of the evidence presented in the reports submitted to this Court and in the hearings held before me. In making the difficult determination as to Zovluck's competence to stand trial the Court will also give consideration to its own impressions and observations of defendant stated below, derived from his many court appearances and his voluminous *pro se* motions.

Dr. Snow, the consulting psychiatrist, submitted a report finding Zovluck competent to stand trial. In her interviews with Zovluck she found him to be "fully oriented, alert and attentive." She found no recent or remote memory defects, his "affect was appropriate" and his mood was "calm, confident and controlled." Although Dr. Snow reported that Zovluck would not cooperate with any formal mental status testing, she found Zovluck to be quite capable of perceiving reality. She diagnosed his antisocial behavior as a result of "maladaptive development" rather than mental illness.

At the trial Dr. Snow reiterated and enlarged on the opinion expressed in her report. One incident which the doctor found to be significant was Zovluck's refusal to take a sodium amytal test. Zovluck had initially agreed to take the test, which contemplates an injection but refused upon the advice in writing of his Court-appointed attorney, demonstrating, in the doctor's opinion, an ability to cooperate with counsel, even when counsel was outside his physical presence. Dr. Snow also found significant Zovluck's refusal to cooperate in any psychological testing and his deliberately invalid responses to such tests as were administered. Dr. Snow took these test results as a sign of malingering, not of incompetency. Her opinion was based on a complete review of his past medical and legal history, including his stay at Springfield, as well as three hours of personal contact with the defendant.

The next witness was Dr. Varhely, Chief of the Psychology Services at Springfield. In his report, submitted prior to the hearing, Dr. Varhely discussed the results of the various psychological tests taken by the defendant.

> "All these responses that he gave me are inconsistent with any true psychosis of paranoid nature that he wants to seemingly appear but are very consistent with an individual who tends to malinger but is not very good at it."

Dr. Varhely also reported that Zovluck interacted in a normal fashion with his fellow inmates, ceasing to do so only when he saw a doctor approaching. He concluded his report by stating his belief that Zovluck is competent to stand trial and is malingering in order to be found incompetent.

At the hearing Dr. Varhely testified that his conclusions were based on the results of the psychological tests administered to Zovluck as well as his personal observations. Dr. Varhely testified that the nature of Zovluck's responses invalidated the tests. For example, Zovluck was given the well known Rorschach test by Dr. Varhely, a test in which he was asked to state interpretations of ten ink blots. Since Zovluck gave only a standard response to each print he was shown, Dr. Varhely terminated the test after only five plates.[3] At that point,

---

**3.** Zovluck's response to each plate was either, "The FBI is killing my parents" or "the devil and the FBI". Zovluck was, in fact, an informer for the FBI from 1972 to 1975. Since his indictment in 1975, Zovluck has expressed the repeated notion that the FBI (in league with the devil) killed his parents and seeks to kill him.

Dr. Varhely believed that if this was truly Zovluck's fear he would have interpreted the ink blots with greater detail—along these lines—"I see the devil (who is really an FBI agent) on the one side . . . I see my parents on the other . . . the FBI agent is trying to kill my parents . . . he's got a weapon . .

the doctor concluded that Zovluck was simply refusing to submit himself to a test which might lead to an accurate diagnosis of competence. Dr. Varhely testified that a mentally ill person would *not* respond in this manner.[4]

After reviewing all of the psychological tests, Dr. Varhely concluded that the defendant was not mentally ill, that he was malingering, and that he was competent to understand the charges against him and to cooperate with counsel.

Dr. Eardley, Chief of Psychiatry, followed Dr. Varhely on the stand. After Zovluck's first stay at Springfield, Dr. Eardley had submitted to the Court a letter reporting the staff's finding that Zovluck was legally incompetent. This letter did not incorporate Dr. Eardley's personal evaluation, as he had not examined Zovluck during the latter's first commitment. Following Zovluck's second commitment, Dr. Eardley submitted to this Court two reports, one based on his own personal interviews of the defendant and one based on a staff conference held to consider defendant's case.

Dr. Eardley's first report was based on several interviews and some personally administered testing. The report is inconclusive, vacillating between a finding of incompetency and of malingering. In his second report, following the majority view expressed in the staff conference, Dr. Eardley concluded that the defendant is competent. Dr. Eardley based this conclusion on

the apparent inconsistencies in Zovluck's behavior; *i. e.,* his adequate social interaction with the inmate population as contrasted with his passively uncooperative interaction with the staff; his test results as contrasted with the psychosis he attempts to demonstrate; his eating habits; and his limited verbal abilities when in contact with staff members as contrasted with his demonstrated verbal abilities in these proceedings.

Dr. Eardley's testimony generally followed the outline of his report. It can be summarized by a brief excerpt from the record:

"DR. EARDLEY: In view of the documented evidence that the Assistant United States Attorney has given me, in addition to Dr. Snow's report, Dr. Varhely's report with adequate testing, plus my own testing, plus my own interviews with this individual, this leads me to believe that he can, under Title 18, Section 4244, does know the nature of the charges, proceedings against him and can cooperate with his attorney if he so desires.
Q: At this point in time how firm is your opinion in that regard?
A: Very firm." (Transcript, Oct. 7, 1976, p. 129).

At the close of the Government's presentation, defense counsel asked to have an impartial panel of psychiatrists examine the defendant. I denied this request but authorized the appointment of an independent psychiatrist of the defendant's choosing.

---

a beam, a laser . . . they can't get away . . . ." and so forth. Dr. Varhely found the flat and repetitive response to be suspicious.

4. Dr. Varhely gave similar testimony with respect to the other tests administered. The Minnesota Multiphasic Personality Inventory (MMPI) was given to Zovluck on three occasions. Each time the results demonstrated that Zovluck was refusing to tell the truth, thereby invalidating the test results. Dr. Varhely concluded that the defendant was feigning or malingering. The MMPI has a particular validity scale which is intended to separate the malingerer from the truly ill subject. Each test score revealed that Zovluck's validity rating was that of a malingerer.

On another occasion the Shipley Institute of Living Scale was administered which is used, in part, to determine the patient's intelligence. Zovluck scored a projected intelligence score of 80, which is in the mildy retarded range. Dr. Varhely does not believe this to be an accurate reflection of Zovluck's intelligence. Questions which Zovluck was apparently unable to answer when taking the test, were answered with ease when Dr. Varhely posed the same questions orally at a subsequent interview. Similarly, questions which Zovluck claimed to be unable to answer in an oral interview, were correctly answered on the test. Dr. Varhely also found these test results to be incompatible with Zovluck's demonstrated ability to write legal documents in connection with the instant legal proceedings. (See further discussion *infra*, pp. 724–725.)

Dr. Kinzel, defendant's psychiatrist, submitted his first report to me on December 1, 1976. After an examination, the doctor concluded that the defendant was incompetent to stand trial. Dr. Kinzel based his conclusions on a personal interview with the defendant which took place at the Metropolitan Correctional Center. Dr. Kinzel found the defendant to be seriously mentally ill, so psychotic as to be incoherent, and suffering from hallucinations and a persecution delusion. His diagnosis of defendant is "schizophrenia, chronic and severe." The doctor did not find Zovluck to be dangerous (in the sense of injuring others) and therefore recommended immediate hospitalization.

In addition, Dr. Kinzel found no signs of malingering, the indicia of which he then delineated:

"dramatic acting, special familiarity with textbooks of psychiatry, unusually superior intelligence, professional criminal background, findings incompatible with mental illness, frequent legal manipulation in the past, notoriety, unusually proficient conning ability, impostering, impersonating, etc."

Dr. Kinzel then stated that no basis for the charge of malingering had been brought to his attention.

In his testimony, Dr. Kinzel admitted that he had spent only twenty minutes with Zovluck.[5] The only other information at his disposal was a communication from a Mr. Lewis Capp, a friend of the defendant, which challenged the evaluation and judgment of the staff at Springfield.[6] Mr. Capp's memorandum specifically criticized the adequacy of the testing procedures as applied to Zovluck. Dr. Kinzel persistently noted that no material had been brought to his attention which pointed to malingering.

The parties then agreed that Dr. Kinzel would be given Zovluck's complete file, including his past hospitalizations, legal encounters, and records from Springfield, so that the doctor could reevaluate the defendant's competency with a complete and comprehensive record.

After a review of these materials and a second personal examination, Dr. Kinzel sent a second report to this Court in which he again found Zovluck to be incompetent to stand trial. The findings in the second report are primarily based on Zovluck's extensive medical history and on several conversations with Zovluck's friends and relatives.

Dr. Kinzel testified again following submission of this second report. He stressed defendant's long history of mental illness, demonstrated by numerous hospitalizations and long term treatment by several psychiatrists. Dr. Kinzel rejected the Government's suggestion that these hospitalizations may have been related to defendant's escalating legal problems.

When questioned with respect to defendant's prior conviction for mail fraud, the doctor expressed the opinion that Zovluck was not competent to stand trial at that time and may not have been guilty of the alleged crimes. Dr. Kinzel adopted this position upon a review study of the defendant's file. The doctor testified that:

"DR. KINZEL: From reviewing all the information, my impression is that he was not principally involved in any scheme [the mail fraud scheme of which he was tried and convicted].

THE COURT: He was not what?

THE WITNESS: Principally involved in any scheme. My impression is that he may have been used as a scapegoat or manipulated by a group of individuals

---

5. Dr. Kinzel explained the brevity of his interview by noting that it was pointless to continue since Zovluck was unable to focus on the questions posed. His thought processes were constantly interrupted by hallucinations and delusions which were so distracting as to be incapacitating. The doctor was satisfied that he could make correct findings from the time he spent with the defendant.

6. Lewis Capp has written several motions and memoranda in these proceedings. He was engaged with the defendant in the illegal mail fraud scheme involving a chiropractic clinic of which defendant was convicted in 1969. He was also a witness at that trial. See *Zovluck v. United States*, 448 F.2d 339 (2d Cir. 1971).

but that he himself was not in any way a prime mover in the scheme." (Transcript, Dec. 16, 1976, p. 76).

Dr. Kinzel reached this conclusion upon his belief that defendant was simply not capable of planning and executing so complex a scheme to extort money, as that found in *Zovluck v. United States*, 448 F.2d 339 (2d Cir. 1971).

Dr. Kinzel testified that in addition to a study of the documents, he had conducted an hour-long examination of the defendant. He questioned Zovluck regarding the various tests administered at Springfield. Zovluck reported, and Dr. Kinzel believed, that he had received inmate assistance in responding to the tests since "he was terrified that if he responded to the tests himself, that he would be sent away forever to a mental hospital." (Transcript, Dec. 16, 1976, p. 87). Dr. Kinzel explained the invalid test results on this ground, rather than on any theory of intentional malingering or feigning. The doctor further testified that he did not believe that Zovluck had prepared or substantially assisted in the preparation of any legal documents in these proceedings. He also testified that even if it could be demonstrated that Zovluck had prepared several of the legal papers, this would not alter his opinion as to Zovluck's competency to stand trial, but would only indicate that Zovluck had coherent moments.

As in the first interview, Dr. Kinzel found that Zovluck's thoughts were continually interrupted by delusional hallucinations. From this, Dr. Kinzel concluded that Zovluck would be unable to assist in creating a legal defense, since he could not communicate adequately the events which transpired.

Throughout vigorous cross-examination, Dr. Kinzel maintained that defendant was mentally ill, incompetent to stand trial, not malingering and in need of immediate psychiatric care. Dr. Kinzel testified with great sincerity, and I find that his opinions resulted from his honest and highly professional judgment of Zovluck's condition.

In conclusion I find that the Government has demonstrated by a preponderance of the evidence, that the defendant Zovluck is competent to stand trial at this time. While it is impossible to reconcile opposing opinions of highly qualified professionals, and while both opinions may be accurate and acceptable in certain medical circles, this Court has the obligation to make a legal decision. This decision is not made lightly as it involves the constitutional rights of this defendant. My determination of competency is based particularly on the following findings, as well as the entire record before me in these proceedings:

1. The mere fact that defendant has a long history of mental illness and has received treatment for his illness is not conclusive of incompetence to stand trial. I find, in accordance with much of Dr. Kinzel's testimony, that the defendant is mentally ill to a degree, but is not so impaired as to be unable to understand the charges against him and assist in his own defense.

2. The numerous motions submitted by defendant or his friend Lewis Capp are strong evidence of Zovluck's ability to understand the charges against him and assist in his own defense. I find that defendant must either have written these motions himself or given substantial aid to the true author. In either case, Zovluck's participation indicates his ability to relate, the facts of the events leading to this indictment.

3. Zovluck's obedience to his counsel's directions to refuse the sodium amatyl test demonstrates that he does have the ability to cooperate with counsel in his own defense.

4. Zovluck's ability to conduct his own defense at the suppression hearings contrasts with the apparent test results of deficient intelligence and inability to concentrate for more than a few moments. His conduct at the suppression motion may have been counter-productive, and not up to the level of performance of an attorney, but it was sufficiently adroit that it was not the action of a man with an IQ of 80. He demonstrated an aware-

ness sufficient to allow him to cross-examine witnesses.

5. I find Zovluck to be a malingerer. The test results, discussed at length in the testimony, do appear to be invalid. These tests are, I find, designed to test the validity of the responses submitted. Zovluck's effort to disguise his true mental capacity (i. e., his projected IQ score of 80) is only one example of his transparent effort to fake the examinations. Dr. Kinzel's explanation of the test results is plausible but not convincing in this case. Even if inadequate supervision rendered the MMPI results invalid, this would not explain the invalid responses on the Rorschach and other examinations which were personally administered. This finding of malingering is not incompatible with the finding above of some mental illness. The two can coexist.

6. Zovluck fits the definition of a malingerer set forth by Dr. Kinzel in his first report. Dramatic acting can be noted in Zovluck's habit of eating food from garbage cans, and refusing to sit, or sitting in a fixed, hunched over position while in Court.[7]

Zovluck has also engaged in frequent legal manipulations both in these proceedings and those involving his prior conviction. He has shown himself to be a professional criminal, and has demonstrated unusual ability to gull the unwary,[8] and, according to the doctors at Springfield, has acted and performed in a manner incompatible with mental illness.

7. I further find that Zovluck can manipulate his behavior from day to day. Reports of differing social behavior before the staff in contrast with the inmate population are credible. Reports of sudden shifts in demeanor upon the approach of a physician or a court officer have also been noted.

8. Finally, my personal observations of the defendant have led me to conclude that he is aware of the legal proceedings against him, follows these proceedings with attention, consults with counsel and is able, on occasion, to speak coherently in his own defense.[9] Having seen and heard the defendant I cannot but believe that the preponderance of the evidence favors the conclusions of the Springfield doctors.

Based on these findings I conclude that this defendant is competent.

I also find that he has certain psychiatric problems for which he should receive psychiatric treatment and counseling while in custody.

The suppression hearing, which was continued when this defendant was first sent to Springfield in February of 1976 must now be completed. A conference will be held before me on January 20, 1977 at 4:00

---

7. During the suppression hearings Zovluck refused to be seated on account of claimed "back trouble." Later, during the competency hearing when asked to sit down he stated that he stood out of respect for Jesus. I then ordered him to sit down. He did so, and remained seated throughout the proceedings. I now believe he was perfectly capable of sitting during his suppression hearing but chose not to do so in order to create an "odd" impression.

8. In *Zovluck v. United States, supra,* at p. 342, the Court of Appeals noted that the trial court had found that "appellant [Zovluck] was a confidence man and a 'consummate actor,' and that his eccentricities were designed to create an 'image.'"

9. The record of the suppression hearing provides convincing evidence of Zovluck's ability to understand the charges against him. During cross-examination I allowed a witness to respond to a question posed by Zovluck regarding the use of false names on credit card applications. The following colloquy occurred:

"THE COURT: That is what this case is about, isn't it?
MR. ZOVLUCK: No, the case is about fraud, committing fraud in attempting to deceive and—fraud.
THE COURT: Yes, all right.
MR. ZOVLUCK: I understand." (Tr., Dec. 23, 1975, p. 271).

The suppression hearings also demonstrate Zovluck's ability to cooperate with counsel when he chooses to do so. Although Zovluck appeared *pro se*, he consulted frequently with counsel, accepted notes from counsel, and, when cross-examining witnesses, propounded questions which counsel had prepared, as well as his own questions.

o'clock in courtroom 705 for the purpose of scheduling further proceedings.

So Ordered.