**UNITED STATES of America**

v.

**William BLOHM, Defendant.**

**No. 83 Cr. 303 (RWS).**

United States District Court,
S.D. New York.

Nov. 28, 1983.

As Amended Feb. 10, 1984.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for United States of America; Martin J. Auerbach, Asst. U.S. Atty., New York City, of counsel.

Ralph S. Naden, New York City, for defendant.

James A. Cohen, Washington Square Legal Services, Inc., Supervising Atty., Jo Ann Wallace and Norman Bock, law student interns, New York City, amicus curiae.

## OPINION

SWEET, District Judge.

Defendant William Blohm ("Blohm") has been indicted for mailing two threatening letters to a federal judge and his clerk, in violation of 18 U.S.C. §§ 876 and 1503. The Government has moved pursuant to 18 U.S.C. § 4244 to have this court determine whether defendant is competent to stand trial on these charges. For the reasons

stated below, the court finds that Blohm is incompetent to stand trial within the meaning of 18 U.S.C. § 4244. Blohm is committed to the custody of Attorney General of the United States pursuant to 18 U.S.C. § 4246 until he is declared competent by this court or until the pending charges are deferred or otherwise disposed of. A progress report will be forwarded to the court and the parties within 70 days of the date hereof with respect to his competency and dangerousness and a hearing will be scheduled within 20 days thereafter.

## I. Procedural and Factual History

The history of the acts leading up to Blohm's alleged crime, and the subsequent proceedings before this court, are relevant to the matter at hand. On March 18, 1982, Blohm commenced civil action 82 Civ. 1684 before the Honorable Charles E. Stewart of this Court. The action, in which Blohm was *pro se*, involved a claim of copyright infringement against Trans World International, Inc. ("TWI"). In the course of the litigation, Judge Stewart granted defendant's motion for summary judgment and decided certain other motions against Blohm. Blohm's appeal from Judge Stewart's decision was dismissed. In the course of the litigation and in apparent response to his lack of success in it, Blohm began to submit letters and other materials to the Judge's chambers, including the following:

1. A letter to the judge's law clerk stating that "This court's penchant for secretiveness is very disturbing. If it would respond to my efforts to influence it I should not try to intimidate it."

2. A "complaint" charging Judge Stewart with conspiring to suppress evidence sought by Blohm in the litigation before Judge Stewart; the "complaint" stated that the Judge Stewart, Richard Nixon and Arnold Palmer were all in the conspiracy, because "they all play golf."

3. A letter addressed to Judge Stewart stating, "If you're *unnecessarily* prolonging inaction or delaying action on these motions before your court, that is a *denial of due process* and I will take the

appropriate steps to remedy the situation. I didn't file this civil action to win any popularity contest."

4. A motion to have the civil case reassigned because of Judge Stewart's "possible association with" the defendant in the civil action, apparently because Arnold Palmer was on the board of directors of a corporate relative of TWI.

5. A letter to Judge Stewart stating "THE DIFFICULTY I FIND MYSELF IN AT THE PRESENT TIME IS NOTHING COMPARED TO THE DIFFICULTY YOU WILL FIND YOURSELF IN WHEN THIS THREAT MATTER IS ADJUDICATED IN COURT. YOUR DAYS AS A FEDERAL JUDGE, AND THOSE OF YOUR COLLEAGUES ON THE 2ND CIRCUIT COURT OF APPEALS, ARE NUMBERED. I SEEK NOTHING MORE THAN YOUR REMOVAL FROM THE BENCH, THE 'TRUE' THREAT IN THIS MATTER, AND YOU KNOW IT. IF YOU EVER HAD THE FEAR OF GOD, YOU'D BETTER HAVE IT NOW. AT THE VERY LEAST, YOU'LL BE INDICTED IN THE PRESS."

This stream of letters culminated in the actions that were the basis for Blohm's criminal indictment. He mailed a letter addressed to Judge Stewart, care of his law clerk, stating "IF I DON'T GET THE RELIEF I SEEK FROM THE U.S. COURT OF APPEALS, I'LL BRING A SAWED OFF SHOTGUN TO THE U.S. COURTHOUSE FOR THE PURPOSE OF ASSASINATING...". He also mailed an envelope addressed to Judge Stewart and his law clerk containing a shotgun shell box and a holder for firearms ear plugs.

Blohm's criminal indictment was assigned to this court. On May 5, 1983, upon the Government's motion, Dr. Naomi Goldstein, a qualified psychiatrist, was ordered to examine Blohm to determine his competence, as well as his tendency to commit violence which was deemed relevant to the bail motions before the court. Dr. Goldstein submitted her report on June 27, 1983. On June 20, 1983, this court issued a similar order pursuant to 18 U.S.C. § 4244 directing that Dr. Stanley Portnow, also a qualified psychiatrist, also examine Blohm

for the same purpose. Dr. Portnow submitted his evaluation on July 29, 1983.

Blohm was granted bail on condition that he engage in outpatient psychological counseling and that all communications with the court be had through counsel. Both conditions remain unfulfilled, but bail has not been revoked. At a conference with counsel held on June 28, 1983, this court requested that the Government consider Blohm for its deferred prosecution program. Blohm indicated a willingness to agree to a program of this sort, and the Government was willing to defer prosecution on condition that the bail terms be continued. While discussions between the Government and Blohm on the details of a deferred prosecution were taking place, the court postponed a hearing on Blohm's competence to stand trial. Finally, on August 2, 1983, Blohm informed this court that he had withdrawn his request for a deferred prosecution.

Vacations, trial commitments of counsel, the schedules of the doctors, and the resolution of the deferred prosecution proposal delayed the hearing on Blohm's competence until October 20, 1983. Testimony was heard from Drs. Goldstein and Portnow and from Blohm on that day and October 21 and 28. In the course of the hearing,

Blohm indicated on the record that he and James Cohen ("Cohen"), who had until then been Blohm's court-appointed attorney, had an irreconcilable difference over Blohm's representation: Cohen recommended to Blohm that he seek a determination of incompetence to stand trial, and Blohm wished to proceed to trial. For this reason, Blohm asked that Cohen be removed as his counsel and that new counsel be appointed. Cohen also stated that the difference was irreconcilable. Pursuant to this request, the court appointed new counsel to represent Blohm. However, because of the question of Blohm's capacity to make decisions in his own best interest, the court appointed Cohen as an *amicus curiae* pursuant to the procedure established in *Seidner v. United States*, 260 F.2d 732 (D.C. Cir.1958)[1] under the direction not to reveal or employ any confidences he had received from Blohm, a difficult and challenging assignment which Cohen undertook as an officer of the court and in what he conceived to be his former client's best interest.

## II. The Standard under 18 U.S.C. § 4244.

■ Under 18 U.S.C. § 4244, a defendant is incompetent to stand trial if he is "so

---

**1.** The facts in *Seidner* were similar to those here. Defendant was incarcerated as a "certified psychotic" in a mental institution run by the Bureau of Prisons. Because defendant thus could not represent himself, the district court appointed counsel to present defendant's case to the court as *amicus*. The *amicus* submitted a memorandum arguing that defendant's sentence should be vacated because he was incompetent at the time he pled guilty. Defendant rejected this idea, however, and refused to argue it before the district court. The district court denied the *amicus'* motion to vacate on the merits. On appeal, the circuit court remanded the case to the district court, directing the court to reconsider the motion. However, the court directed that a special procedure be employed in the proceedings on remand:

> Appellant cannot be master of his own pleadings before the District Court, inasmuch as he has repeatedly disavowed all attempts on the part of others to raise the issue of his competence at the time of his guilty plea. If appellant is indeed mentally incompetent, as the amicus memorandum suggests, we cannot rely upon his election as to whether that issue

is to be raised in his defense. The court below may, at its discretion, appoint counsel to represent appellant's interests, or if he persists in refusing counsel the court may appoint an amicus curiae to present the case independently.

260 F.2d at 734. Blohm's competence, like that of the appellant in *Seidner,* was sufficiently in question at the time of the hearing that his election as to how to proceed on the defense of incompetence was unreliable. As a result, in this case the *Seidner* reasoning called for the appointment of an *amicus* to argue for Blohm's incompetence. However, the court was aware that Blohm's true interest in the competency issue is not clear: findings of competence or incompetence could both have had dire consequences for him. Therefore, to provide him with maximum protection, the court also appointed separate personal counsel for Blohm, directing that the counsel present whatever viewpoint Blohm preferred. On Blohm's direction, counsel represented Blohm at the hearing with a goal of having Blohm held competent.

mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense". Under the still-controlling Supreme Court interpretation of this language, *see Brown v. Warden*, 682 F.2d 348, 351 (2d Cir.), *cert. denied*, 459 U.S. 991, 103 S.Ct. 349, 74 L.Ed.2d 388 (1982), the "test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as a factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960). *See also Drope v. Missouri*, 420 U.S. 162, 172, 95 S.Ct. 896, 904, 43 L.Ed.2d 103 (1975).

All counsel agree as to the applicability of the *Dusky* standard. All concede, and I concur, that Blohm has a factual understanding of the proceedings against him, including a factual understanding of the applicable statutes and procedures. It is the determination of *rationality* about which the dispute centers. I conclude that the rationality to be demonstrated is that of an objective rationality, what would be regarded as rational to the average person, not to the defendant, not to the psychiatrists, who in this instance considered Blohm competent because his perspective and his acts were consistent with his felt need, his delusion. I conclude that the technical standards which the psychiatrists considered were entirely appropriate for their professional purpose but failed to include the sense of rationality as it is commonly understood. Hence, in my view, the Government and Blohm have urged upon me too narrow a standard. "Rational," as used in the cases, must not be devoid of common understanding, and it is the court to which the society has assigned the decisional task, not the medical profession. This difference in standards is presumably the reason that Dr. Goldstein, though maintaining that Blohm was "rational," when asked for another word that described him replied without hesitation "Crazy ... It looks crazy to the rest of the world." (Goldstein Tr. at 128.)

■ The burden of proving the defendant's competence to stand trial is on the Government.

[W]hat we are determining is a rule of law, of due process dimensions, that a defendant, about whom the evidence of competency to stand trial is in equipoise, should or should not be tried. If, as the Court has made clear, the concept of competency to stand trial is grounded in notions of fundamental fairness in the operation of the judicial process, *see Drope v. Missouri, supra*, 420 U.S. at 171–72, 95 S.Ct. 896 [903–04], the question can only be answered in the negative. Evidence showing competency must be more presuasive than that showing incompetency. Of necessity, then, there is no room for a rule of law placing any burden of proof on the defendant.

*United States v. DiGilio*, 538 F.2d 972, 988 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977). The Government must prove competence by a preponderance of the evidence. *Brown, supra*, 682 F.2d at 351.

■ The prohibition against trying an incompetent defendant is of a constitutional dimension, and derives from the due process right to stand trial. *Drope, supra*, 420 U.S. at 171–72, 95 S.Ct. at 903–04; *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). As the District of Columbia Court of Appeals noted above in *DiGilio*, the requirement that the burden of proving competence be on the Government is also a demand of due process. However, especially where, as in this case, a defendant indicates a desire to be held competent and to proceed to trial, due process considerations that point toward caution in holding a defendant *in* competent are also relevant. A finding of incompetence to stand trial under § 4244 permits the court to commit the accused to the custody of the Attorney General,—in effect, to commit him to a mental institution—for an extended period. The Court of Appeals of this Circuit has noted that

a determination that a defendant is incompetent to stand trial is not necessarily of benefit to the defendant. Although in New York a finding that a defendant is incompetent to stand trial no longer results in a potentially indefinite commitment to a mental institution, [citations omitted], it will generally lead to confinement of the defendant even though there obviously has been no finding of guilt of the crime charged. [citations omitted] In some instances, this period of confinement could ultimately prove to be longer than the term of imprisonment which the defendant would have served upon conviction of the crime charged. [citations omitted] A commitment to a hospital for the criminally insane also may place the defendant in a situation in which he is subject to stricter custody, fewer privileges, and more unpleasant conditions than those to which he would be subject in an ordinary prison. [citations omitted]. In addition, such a finding does jeopardize a defendant's Sixth Amendment rights to be tried for the crimes charged, and to be charged as speedily as reasonably possible. [citations omitted]

While it is often true that neither the right to stand trial nor the right to be speedily tried is vigorously pursued by accused persons, [citation omitted] it is important to note that the issue of mental competency to stand trial is unique in that this right of the defendant can be raised not only by the defendant himself, but also by the prosecution, [citations omitted], and it *must* be raised by the court, on its own motion, whenever there is sufficient reason to doubt the defendant's competence. [citations omitted] The issue can be so raised even though, as discussed, a finding that a defendant is not mentally competent to stand trial may, in fact, work to *his* detriment, rather than that of the state.

*Brown, supra,* 682 F.2d at 352–53.

Evidence useful to the court in making its determination of competency may come from several sources. Testimony from psychiatrists is of course relevant, but there is indication that such testimony is to be viewed only as advice to the court, not as determinative of the court's decision. *See United States v. David,* 511 F.2d 355, 360 n. 9 (D.C.Cir.1975); *United States v. Zovluck,* 425 F.Supp. 719, 721 (S.D.N.Y. 1977) (cited with approval in *Brown, supra,* 682 F.2d at 351 n. 2).

The cases interpreting the incompetency standard state that an extremely important source of evidence regarding the defendant's competence is the behavior—both before the court and elsewhere—and the testimony of the defendant himself. In *Drope, supra,* the Supreme Court remanded a case to the trial court because the court had given insufficient attention to the defendant's behavior as an indicator of incompetence. 420 U.S. at 178–82, 95 S.Ct. at 907–09. Similarly, in *United States v. Oliver,* 626 F.2d 254 (2d Cir.1980), the Court of Appeals, in affirming the trial court's determination regarding competency to stand trial, noted among the factors relevant to this determination the defendant's "heavy drug use, [citation omitted] lapses of memory, unresponsiveness, inconsistent answers during interviews with counsel, low intelligence, and unexplained refusal to testify at the trial of the co-defendants." The Court also noted that the trial judge "justifiably relied on his extended observations of Oliver" in deciding the competency question. 626 F.2d at 258–59.

### III. Application of the Standard to the Facts of this Case.

■ Blohm has attended college, and his educational record, his testimony and his writing demonstrate intelligence and a capacity to not only understand but to seek to manipulate the proceedings in which he is involved. He understands that charges in the indictment against him, if established, can subject him to a term of imprisonment. He does not believe he will be convicted and has stated that he sought to initiate the criminal proceeding in order to expose the conspiracy in which he believes Judge Stewart to be engaged. The issue is not his ability to understand, in the sense of being able to recite the legal consequences

of certain acts, but rather to evaluate the realities of his situation in order to assist his counsel in his defense. As stated in Random House Dictionary of the English Language (1970) "understand" means "14. to have a systematic interpretation or rationale, as in a field or area of knowledge: 'He can repeat every rule in the book, but just doesn't understand.'"

As the cases direct, the court, in making a determination as to Blohm's competence to stand trial, has examined two categories of relevant information: psychiatric testimony, and the behavior and testimony of Blohm himself. The primary element in the court's determination that Blohm is incompetent under the statute is the behavior and testimony of Blohm. The most relevant behavior is Blohm's series of communications with this court and other parties to Blohm's civil and criminal cases over the time during which these cases have been pending. These communications, which Blohm persisted in despite the court's prohibition of them as a condition of bail, include the following:

1. A letter to the office of the United States Attorney stating "I WANT THE THREAT MATTER BROUGHT TO TRIAL SO THAT I MAY BRING INTO QUESTION THE (FAULTY) DECISIONS CONCERNING MY CIVIL SUIT AS MITIAGTION ... SUGGESTING CONSPIRACY. KNOWING THAT THE PROSECUTION DOESN'T WANT ANY EMBARASSMENT FOR THE JUDGE OR JUDGES INVOLVED IN THESE DECISIONS, THE RESULTANT PRESSURE FROM THE SPECTRE OF A TRIAL WILL FORCE (TWI) TO NEGOTIATE, OR ELSE THE PUBLIC WILL PERCEIVE A CONSPIRACY AND CLAMOR FOR DUE PROCESS." Another letter said that Blohm's "pseudo-threat" to Judge Stewart and his clerk was "SUFFICIENT ENOUGH (IN MY MIND) TO BRING ABOUT MY REAL PURPOSE OF ARREST AND INDICTMENT AND PROSECUTION; AND AS SUCH BRING ABOUT THE *REAL* THREAT I ESPOUSE IN THIS MATTER, THE SPECTRE OF A JURY TRIAL IN ORDER TO EXPOSE A CONSPIRACY TO OBSTRUCT JUSTICE? OR MAYBE SOMEONSE THINKS INDICTING ME WILL MAKE ME *BALK.*"

2. A motion delivered to this court asking that the court furnish certain information regarding the golf conspiracy to the Federal Bureau of Investigation. The motion noted that the court's failure to grant it had "its own implications, and could be construed as a tacit approval or understanding or knowledge of an ongoing conspiracy and/or concomitant cover up and leaves itself vulnerable to a charge of obstruction of justice".

3. A request that this court subpoena witnesses to enable Blohm to demonstrate the existence of a conspiracy among certain federal judges.

4. Subpoenas, mailed to this court by Blohm, for Judge Stewart and two other persons who have names that are similar or identical to that of Judge Stewart. A letter mailed to the court by Blohm explained that the subpoenas would demonstrate that one or both of the two other persons subpoenaed did not exist.

5. Letters to the court stating that James Cohen, Blohm's attorney until the start of the hearing, was not listed in a recent edition of Martindale and Hubbell, and that for this reason Blohm felt he had been "fraudulently represented by someone posing as an attorney" and that as a result his constitutional rights had been violated.

6. A letter to the court enclosing a civil complaint and summons apparently filed in federal court in New Jersey stating a cause of action for false imprisonment based on the arrest warrant issued against Blohm for this criminal indictment. The complaint names as defendants this court, another Judge of this District, three Magistrates for this District and the Assistant United States Attorney prosecuting this matter against Blohm.

7. Obscene, threatening letters sent as recently as October 31 and November

3, 1983 to a Ms. Simpson, an attorney representing TWI in Blohm's civil suit.

Blohm's testimony at the competency hearing indicated his continued acceptance of the ideas in these communications, and brought out additional indications that he is not competent to stand trial. His testimony included the following:

1. Blohm was able to identify the citations for the laws he has been charged with violating (Tr. at 174) and the maximum number of years of imprisonment for conviction of those crimes (Tr. at 218). He was also able to describe the roles of defense counsel, prosecution and court in a criminal trial. (Tr. at 174–76)

2. Blohm testified that he had set the world record for the sit-up lift (Tr. at 191–92), even though he trains with weights for only one-half hour per day. (Tr. at 243). He also testified that the story of this athletic accomplishment is the basis for the autobiographical film script whose possible infringement was the alleged basis for the civil suit before Judge Stewart. (Tr. at 191–92).

3. He testified that he still believes in the possibility of the golf conspiracy, as a specific, personal collaboration. (Tr. at 206–07, 236).

4. He testified on direct examination that "this criminal matter is an extension of my civil litigation, that's all pure and simple. I couldn't get justice in the Civil Court so I brought it into a criminal context." (Tr. at 216–17).[2]

---

2. Blohm testified on direct examination:

Q. And you believe that Judge Stewart may well have conspired with the defendant, TWI, in this case?
A. Yes, I do.
Q. I assume that's why you have been writing all these letters and engaging in all these lawsuits, to get to the bottom of that?
A. Yes.
Q. Is that what this is all about?
A. Yes, you hit the nail on the head.
Q. Is there anything more you want to tell us about your thinking on that, because you are the one whose thinking is [at issue] here?
A. I want to get at the truth, and I feel the Court has not been assisting me in that regard.
Q. Which Court?
A. This Court, Judge Stewart's court. I want to get at the truth, essentially. If I am mistaken, I'll accept that. If I am mistaken about this conspiracy, whatever, that there is nothing going on, nobody is trying to rip off my film treatment, if that can be established with incontrovertible evidence of some kind or other, affidavits or whatever, I would be willing to accept a deferred prosecution on this matter. But nobody seems to want to help me satisfy my own mind as to what are my own suspicions here.

That's all I am seeking, is the truth in this whole matter. I don't want to play games with people, I don't want to play games with the Court, take up the Court's time, file lawsuits, manipulate people. I don't want to do that but I feel I have no choice because nobody wants to help me get at the truth to satisfy my mind. It is important, I don't think I got justice.

I was given short shrift in that civil suit. There were questions unanswered and just swept under the rug, you know, goodbye, we don't have time to bother with this, if that was the thinking.

On the other hand, it could have been as a deliberate coverup, I don't know. But there are a lot of unanswered questions here.

I don't think I can afford just to, you know, turn around and just forget it, because I have property here that is very valuable to me, and if these people go ahead and use it, they might destroy it forever, and I have nothing to show for it. I have nothing to show for 25 years of my life, that's what that film treatment represents to me, 25 years of my life, not just eight pages of writing. I mean it only took two hours to write, but it represents 25 years of my life, and that's my whole stake in this whole thing, that's the bottom line.
Q. So your life is at stake?
A. My life?
Q. The integrity of your life is at stake. Is that a fair statement?
A. Sure.
Q. When you say 25 years of your life is at stake—
A. As represented by that film treatment.
Q. That is a pretty significant treatment that you feel is being ripped off.
A. I didn't make those things up, I live those things. I would like them to count for something, you know. On their face they look, you know, they look ridiculous.
Q. Like what?
A. But it doesn't mean they are not entertaining, and I think TWI saw the entertainment value in it and wants to use it. And they are trying to pull all kinds of strings to use it and not pay for it, not pay me for it. That's my feeling. It is a honest feeling. And up to this point nobody wants to listen to me. Nobody gives my perceptions any considerations. All they want to do is, it seems to me,

Both psychiatrists testified at the competency hearing that they believed Blohm was competent to stand trial although, as indicated above, Dr. Goldstein testified that using lay standards Blohm would be considered "crazy." Their testimony was simply that he could comprehend the possible consequences of his acts. However, their testimony included several observations that support the court's conclusion that Blohm is incompetent to stand trial. Perhaps the most important of these observations concerns Blohm's belief in a conspiracy, discussed in detail above. Both psychiatrists testified that Blohm has an accurate intellectual understanding of the nature of the charges against him, the criminal proceedings that lie ahead of him and the penalties that may result. They also testified, however (Portnow Tr. at 31–32; Goldstein Tr. at 105), that the dangers of a trial—the chance that he will lose and go to jail—are not important to him: He feels that he will be completely vindicated when he has an opportunity to present his conspiracy theory to a jury, to the media and to the public. As Dr. Goldstein explained (Tr. at 71), the opportunity to have a great deal of attention paid to him, especially by the court, is worth the risk of going to jail.

Dr. Goldstein also stated (Tr. at 91) that, in her view, Blohm truly believes in the conspiracy. Dr. Goldstein characterized this belief as "delusional"—a false, "unshakable" idea. She described Blohm's conspiracy beliefs as "psychotic and irrational." (Tr. at 91–92.) The delusional nature of Blohm's thoughts is all the more important to the competency question, Dr. Goldstein testified, because the delusional thoughts concern the court itself. (Tr. at 95.)

Dr. Goldstein, whose testimony was sensitive and caring, explicitly stated the difficulty of relating the psychiatric and legal standards and pointed out that Blohm might well conclude for his own purposes that a term of imprisonment might be preferable to a purposeless unsuccessful existence outside prison. Both doctors agreed that Blohm suffered from paranoid delusion and was obsessed by the litigation which now provides him with a purpose and attention, all too significant attention. His psychological needs are thus being satisfied by his manipulation of the justice system, first in the civil action and now in this criminal action which Blohm now believes he initiated. Dr. Goldstein recognizes that Blohm's obsession may be such that he cannot resist doing whatever he feels is necessary, in this instance threatening a judge, to keep his obsession, now in the form of his litigation, alive. The progression of the delusion is evident. From his delusion of a capacity to set a world's record in a feat of strength [3] Blohm moved

---

they just want to protect Judge Stewart from whatever, criminal prosecution, or just embarrassment, I don't know.

But I tried, I tried to talk to Judge Stewart on my own, you know, man to man, personally, about this situation, but he refused. I don't know for what reason. But it just makes one more suspicious that there is something going on, that I am not supposed to know about.

(Tr. at 201–15). Blohm testified on cross examination:

Q. So the suit isn't simply to prove that a conspiracy exists but rather is a vehicle for you to explore whether it exists or not; is that correct?

A. Yes, at the very least, yes.

Q. But you are not interested in going to trial because you are sure that you can prove a conspiracy existed?

A. Nothing is ever a sure thing.

.    .    .    .    .

A. I intend to bring up Judge Stewart's decisions and my thoughts about what motivated me to write the threatening letters in order to get attention, get arrested and for all that.

Q. When you use the phrase, though, at the very least, are you saying by that that you are certain that you can prove that a conspiracy existed and that's why you are going forward, or that you want to explore the matter?

A. Whether I can prove it or not is one thing, whether it can be construed as such is something else again.

I am going for the construing, first, by a preponderance of evidence, things, incidents, so forth and so on.    .

3. Blohm testified that an article in the newspaper "The York Dispatch" about a man named Bill Williams who had set the world sit-up lift record was actually an article about Blohm. Blohm testified that he was using "Bill Williams" as his name at the time for "theatrical"

to a delusion that his story describing his initial delusion was stolen. That belief, found baseless by the court in the civil suit, was replaced by the delusion that the court was part of the conspiracy to steal. To validate that delusion Blohm would have this court, and the jury, believe that his threats were intended simply to expose the conspiracy. Now this court has become, in effect, part of the conspiracy and has been sued by Blohm.

The most persuasive evidence of Blohm's incompetency is his continued, irrational belief in the golf conspiracy and his hope to use this criminal trial as a forum to "expose" that conspiracy. Blohm testified that when his civil action failed, he tried to get himself arrested so as to "stage a media event" that would bring the golf conspiracy before the court, the jury, the media and the public. In addition, the psychiatrists testified that Blohm holds this belief in the golf conspiracy as an unshakable, paranoid delusion and genuinely views this criminal trial as a way to secure official attention to this and others of his concerns. Both the psychiatrists and Blohm testified that Blohm believes he will be acquitted on the criminal charges (despite the apparent lack of defenses to that charge), and that instead he will be able to use the trial to explore the growing conspiratorial connections against him. In order to reach this trial, Blohm has rejected the advice of skilled and experienced court-appointed counsel that he seek an incompetency finding. (Oct. 20, 1983 Tr. at 3–12; Oct. 21, 1983 Tr. at 219.) Blohm has also twice rejected the Government's offer of a deferred prosecution, stating that he would accept it only if he obtained an injunction against TWI's purported infringement of his screenplay, an unlikely event given the status of his civil suit. (Tr. at 281–82).

Before the court is a criminal defendant who believes he is the world's strongest man, who wrote an autobiographical

effect and for other reasons. (Tr. at 273). A copy of the article is attached to this opinion as

screenplay based on this theme, and then sued a corporation which be believed *might* infringe on the screenplay. When that suit was dismissed, the defendant began to think that it was dismissed because the judge who dismissed it might be in league with Richard Nixon, who appointed the judge, and Arnold Palmer, who was on the board of the corporation's parent, a belief formed because all of the alleged conspirators play golf. After threatening the judge, the defendant now feels that the only way to expose the conspiracy is to proceed to his own criminal trial and use it as a forum to expose the conspiracy. It is evident that the delusion which drives all of this activity is beyond his control, as is his conviction of his extraordinary strength, which in his view will qualify him for the Olympics, which he maintains by his occasional 15-minute exercise sessions and which apparently is the basis for his own self-validation. Both psychiatrists concede that Blohm has a paranoid delusion fixed presently on his need for recognition through litigation. Regrettably the pattern is a familiar one to trial judges in this district.

This finding is fortified by Blohm's conduct and appearance in the courtroom, his mannerisms, and his deferential defiance. Standing alone, his conduct and appearance would not provide a basis for a finding of incompetence but when viewed in connection with his acts and statements already described, his appearance and conduct add to the preponderance of the evidence of incompetence.

The anomaly of the situation is that, superficially, this defendant appears to be competent. Blohm accurately described the roles of the court and counsel in a criminal trial. He has produced a stream of legalistic papers that cite numerous cases and statutes, thereby displaying perhaps a better knowledge of the law than that of many criminal defendants, who

an exhibit.

have appeared in this courthouse. Blohm is obviously articulate and reasonably intelligent. On an intellectual level, then, Blohm understands his current legal position quite well. In addition, both psychiatrists concluded that he was competent to stand trial.

Despite these circumstances, there is strong evidence that Blohm is not competent. Blohm's view of the actual nature of the proceedings, their course and their likely outcome is extremely unrealistic. It cannot be said that, under the *Dusky* test, Blohm has a "rational ... understanding of the proceedings against him" when he believes that his criminal trial will serve primarily as a forum for public exploration of the golf conspiracy—a belief shown, for example, by his subpoenaing of New York City residents with the same name as Judge Stewart to demonstrate that they do not exist, or his motions before this court to furnish the FBI with information on the conspiracy. His understanding of the pending criminal proceedings is necessarily limited by his belief that there is a conspiracy against him involving a growing number of federal judges and magistrates, attorneys and others. It cannot be said that he has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," *Dusky, supra,* when he believes that a trial for criminal charges that could bring him twenty years in jail is merely a vehicle, set in motion by him, to bring out the issues of a closed, apparently meritless, copyright infringement suit, and when he states that his court-appointed counsel was not listed in Martindale Hubbell and thus was "fraudulently posing as an attorney." In short, Blohm's understanding of the pending criminal proceedings is so distorted that he is unable to consult with his lawyer and assist in his own defense. As a result, he is not competent to stand trial under 18 U.S.C. § 4244.

█ In the interest of a complete record and the anticipation that review of this decision and order may be sought, two additional matters deserve resolution.

Blohm has moved to have this court recuse itself under 28 U.S.C. § 455. Blohm has commenced an action brought in the United States District of New Jersey, 83 Civ. 4007, alleging, among other things, that he has been falsely imprisoned. The defendants include myself, the prosecutor, a magistrate and other judges. Several courts have already rejected the proposition that such a suit against the presiding judge is sufficient to require disqualification under § 455. *See Ronwin v. State Bar of Arizona,* 686 F.2d 692, 700–01 (9th Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 2110, 77 L.Ed.2d 314 (1983); *United States v. Grismore,* 564 F.2d 929, 933 (10th Cir. 1977), *cert. denied,* 435 U.S. 954, 98 S.Ct. 1586, 55 L.Ed.2d 806 (1978); *United States v. Bray,* 546 F.2d 851, 857–59 (10th Cir. 1976) (failure to recuse upheld where plaintiff stated, *inter alia,* that he had filed a brief with the court accusing the judge of bribery, conspiracy and obstruction of justice); *United States v. Alberico,* 453 F.Supp. 178, 187 (D.Colo.1977) (no disqualification where plaintiff's affidavit indicated that judge would be sued). As the court stated in *Ronwin, supra,* a judge:

> is not disqualified merely because a litigant sues or threatens to sue him. [citing *Grismore, supra* ] Such an easy method for obtaining disqualification should not be encouraged or allowed.

686 F.2d at 701.

This rule is controlling here. Regardless of the outcome of the New Jersey action, I will not permit Blohm to avoid a determination of issues properly pending before the court by initiating an action against the judge. As Mr. Justice Rehnquist stated in *Laird v. Tatum,* 409 U.S. 824, 837, 93 S.Ct. 7, 15, 34 L.Ed.2d 50 (1972), "a federal judge has a duty to *sit* where *not disqualified* which is equally as strong as the duty to *not sit* where *disqualified.*" Perhaps more than anything else, this recent act reveals Blohm's delusion, and his inability to understand the system with which he is obsessed.

█ The second additional matter to be considered is Blohm's motion that the

charge against him under 18 U.S.C. § 876 be transferred to the District of New Jersey. Although the venue for the charge against Blohm under 18 U.S.C. § 1503 is properly in this district, *see United States v. Kibler*, 667 F.2d 452, 454–55 (4th Cir. 1982), the venue of § 876 charges is in the district from which the threat was mailed, 18 U.S.C. § 3239, which in this case was apparently New Jersey. However, because of the court's disposition of the competency issue (at least as it concerns trial on the § 1503 charge), and also because Blohm's election to have two trials in two venues is not reliable given his state of incompetence, the question of venue need not be considered at this time.

These facts and this troubled defendant have raised profound questions of personal responsibility and personal liberty which underly our criminal justice system and its proper operation. The balance to be struck is vital to the functioning of that system. To permit this manipulation of the system by Blohm to continue would make a travesty of the integrity of the process by which society seeks to order itself. For the reasons stated above, this court determines, pursuant to 18 U.S.C. § 4244, that Blohm is mentally incompetent to stand trial.

▮ Having found Blohm incompetent to stand trial, the court must determine the appropriate disposition of this defendant. Under the relevant statutory scheme, 18 U.S.C. §§ 4244–4246, if the court determines that the accused is (1) "insane or mentally incompetent" and (2) "will probably endanger the safety of the officers, the property, or other interests of the United States and ... suitable arrangements for the custody and care of the prisoner are otherwise unavailable," § 4247, it may commit him to the custody of the Attorney General. § 4246. The accused shall then be released as soon as any of the conditions listed above is no longer satisfied. § 4248. *See Jackson v. Indiana*, 406 U.S. 715, 731–33, 92 S.Ct. 1845, 1854–55, 32 L.Ed.2d 435 (1972); *United States v. Debellis*, 649 F.2d 1, 2 (1st Cir.1981).

Blohm has already been found incompetent to stand trial, and the court finds that the evidence that called for this finding is sufficient to meet the first prong of § 4247. As to the second prong, and in addition to the evidence already described, it should be noted that Dr. Portnow testified that Blohm "could become psychotic under great stress." (Portnow Tr. at 33.) Dr. Goldstein, when asked whether Blohm presented a danger to himself or others, replied "I cannot predict future danger. Right now I think he is okay. There is no history of assaultiveness of any kind, and the only thing I would suggest is if there are any shotguns at home they be removed. But he isn't going out to buy guns; he doesn't have that kind of history." (June 22, 1983 Conference Tr. at 11–12.) From this evidence and from the court's observation of Blohm's demeanor at trial, the court finds that he presents a danger to the officers of the United States. Pursuant to 18 U.S.C. § 4246, Blohm is hereby committed to the custody of the Attorney General until he is mentally competent to stand trial or until the pending charges against him are disposed of according to law or until he is shown to no longer present a danger. A report will be submitted and a hearing held as set forth above. .

**IT IS SO ORDERED.**