**UNITED STATES of America, Plaintiff,**

v.

**James Robert TURNER, Defendant.**

**No. S 83 Cr. 457 (SWK).**

United States District Court,
S.D. New York.

Feb. 21, 1985.

Rudolph W. Giuliani, U.S. Atty., S.D.N.Y. by John M. McEnany, Asst. U.S. Atty., New York City, for plaintiff.

Caesar D. Cirigliano, Federal Defender Services Unit, The Legal Aid Society, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

The above-captioned action is before this Court for a determination of defendant's competency to stand trial. For the reasons stated below, Mr. Turner is hereby found competent to stand trial.

*Procedural History*

On July 13, 1983, Mr. Turner was named in a one-count indictment charging him with the armed robbery of the First Nationwide Savings and Loan Association at 32 East 42nd Street on or about June 28, 1983,* in violation of 18 U.S.C. § 2113(d).**

On July 21, 1983, appointed counsel attempted to interview Mr. Turner prior to his arraignment. At that time, counsel found Mr. Turner to be "disoriented and unable to answer simple questions concerning his personal history," "such as his date of birth, his exact address, [and] how long he had been in custody." At Mr. Turner's arraignment, counsel advised the Court that Mr. Turner was unable to enter a plea, and asked that a plea of not guilty be entered on his behalf, which was done. The case was then assigned to me.

Shortly thereafter, defense counsel requested a conference for the purpose of obtaining an order for a psychiatric examination of Mr. Turner to determine his competency to stand trial. At the conference, counsel advised the Court that he had again attempted to interview his client, but had been unable to obtain basic background information from Mr. Turner. Counsel also advised the Court that Mr. Turner had indicated that he suffered from

* Although the Indictment refers to this as the "First Nationwide Savings and Loan," the papers submitted on this motion refer to the bank as the "First National Federal Savings and Loan." It appears that the Indictment is correct.

** A superseding indictment was handed up, on August 19, 1983, charging Mr. Turner with four additional counts arising out of the armed robbery of two additional banks: The Dollar Drydock Savings Bank at 60 East 42nd Street on or about June 20, 1983, and the Citibank at 250 5th Avenue on or about July 1, 1983.

hallucinations—as counsel relayed them—of being abducted by men dressed in business suits and taken to a warehouse in Queens, where he was given certain medication, and also of an individual who is out to "get" him. Moreover, the Court was advised that Mr. Turner had recently escaped from the Kingsboro Psychiatric Center where he had been confined pending state charges.

In light of this information, the Court felt that there was reasonable cause to believe that Mr. Turner might be incompetent to stand trial. Accordingly, on July 27, 1983, this Court ordered that Mr. Turner be examined by a psychiatrist, Dr. Stanley Portnow, to determine whether Mr. Turner is able to understand the proceeding against him and to properly assist in his own defense. On December 6, 1983, the Court received Dr. Portnow's report. Dr. Portnow concluded that Mr. Turner is competent to stand trial.

Questions regarding Mr. Turner's competence to stand trial remained, however, and on January 3, 1984, this Court, at the request of defense counsel, ordered that Mr. Turner be examined by another psychiatrist, Dr. Naomi Goldstein, to determine whether he is able to understand the proceedings against him and to properly assist in his own defense. On February 9, 1984, the Court received Dr. Goldstein's report. Dr. Goldstein advised the Court that Mr. Turner had refused to be interviewed. Accordingly, she could not render any conclusion as to the issue of his competency; however, Dr. Goldstein indicated that, based on her prior evaluation of Mr. Turner and upon review of the extensive materials submitted to her, she had heard nothing which would preclude a finding of competence.

The Court felt that this incomplete report did not answer the perduring questions regarding Mr. Turner's competence and believed that longer, more in-depth, examination and observation would be helpful in resolving those questions. Accordingly, on February 27, 1984, this Court ordered that Mr. Turner be committed to the United States Medical Center for Federal Prisoners at Springfield, Missouri for observation and psychiatric evaluation. On May 14, 1984, the Court received the report of this evaluation. Again, Mr. Turner was found competent.

Defense counsel requested that one more examination be ordered—this one by a psychiatrist who had previously found Mr. Turner incompetent to stand trial on state charges. On June 25, 1984, the Court ordered that Mr. Turner be examined by Dr. Robert H. Berger. On August 20, 1984, the Court received Dr. Berger's report. Dr. Berger, too, concluded that Mr. Turner is competent to stand trial.

In spite of the unanimity of the doctors' opinions that Mr. Turner is competent, counsel advised the Court that he remained "unable to establish any meaningful communication" with Mr. Turner, and requested a hearing so that the Court could observe Mr. Turner while testifying. The Court held such a hearing on August 28, 1984. At the Court's request the parties submitted post-hearing briefs and the Government provided the Court with the extensive array of materials provided to, and reviewed by, the various psychiatrists in conducting their evaluations. The motion was fully submitted on, or about, December 4, 1984.

*Factual History*

The Court has carefully reviewed the extensive array of materials provided to it by the Government. From its review of those materials, the Court recognizes that Mr. Turner is a young man who has had extensive dealings with the law and with psychiatric evaluations regarding his competency. A brief discussion of those materials, and of Mr. Turner's history, is necessary for a fair evaluation of his current competence to stand trial.

Mr. Turner was born on February 16, 1945, in Indianapolis, Indiana. He is one of five children. He attended school through the seventh or eighth grade.

At the age of fourteen, Mr. Turner was charged with robbery and sent to a boy's

school, where he remained for an undetermined period. In 1962, he was convicted of robbery, sentenced to eleven months, and sent to the Indiana State Farm. While he was there, he suffered a head injury when he was struck with a baseball bat (or some other stick), and was hospitalized at Robert Long Hospital in Indianapolis. Shortly after his release, he was arrested again in Indianapolis, apparently for some form of disorderly conduct and served fourteen days.

Thereafter, he travelled to Brooklyn, New York, to live with a sister. He was arrested on April 30, 1964, shortly after arriving in New York, for grand larceny (purse snatching). The disposition of that charge is unknown. Mr. Turner was then charged with committing manslaughter in the knifing death of one Cleophus Harlee on March 4, 1965. From March 25 to April 22, 1965, he was committed to Kings County Hospital, where he was diagnosed as schizophrenic, chronic, undifferentiated type. From April 22 to December 8, 1965, Mr. Turner was committed to Matteawan State Hospital for treatment. On December 8, 1965, when Mr. Turner was transferred back to Kings County Hospital, the Superintendent of Matteawan certified that Mr. Turner was "no longer in such state . . . as to be incapable of understanding the charge now pending against him or of making his defense thereto." Mr. Turner remained in Kings County Hospital, where he was diagnosed a sociopathic personality and found competent to stand trial, until January 25, 1966, when he was returned to the Brooklyn House of Detention to face the manslaughter charges. After Mr. Turner was tried to a mistrial on those charges, he pled guilty to charges of second degree assault in satisfaction of the charges and was sentenced, on October 10, 1966, to time served.

On December 2, 1966, he was charged with felonious assault. He was committed to Kings County Hospital from December 12, 1966, to January 9, 1967, where he was diagnosed as an emotionally unstable personality, but apparently found competent to stand trial. On June 16, 1967, he was

found guilty of second degree assault and was sentenced to seven to eight years in prison. He was initially incarcerated at Sing Sing, and was ultimately paroled from Clinton Correctional Facility on October 8, 1971.

Mr. Turner was again arrested on April 11, 1972, and charged with sodomy, menacing, and criminal trespass. The disposition of those charges is unknown.

Mr. Turner managed to avoid trouble with the law for a while after that. He lived with his sister in Brooklyn while working for Triangle Maintenance Company as a laborer and porter. In late 1976, Mr. Turner met Carollyn Cox, a woman he planned to marry. He moved in with her in April, 1977. On April 8, 1977, he checked in to Beekman-Downtown Hospital, complaining of dizziness, impotence, and insomnia. After his neurological examination revealed nothing, Mr. Turner was discharged and a final diagnosis of anxiety reaction, no neurological disease was rendered. He was treated as an outpatient for neurodermatitis at Beekman-Downton until approximately October 1977.

On July 21, 1978, Mr. Turner suffered a back injury while working for Triangle Maintenance Company. While he was being considered for workmen's compensation for this injury, he allegedly committed a spree of bank robberies. Between July 24 and December 6, 1978, Mr. Turner is believed to have robbed or attempted to rob at least seventeen banks. He was arrested on December 6, 1978, leaving the Citibank at 141 East 23rd Street in Manhattan, with approximately $5,733 in a blue denim bag and a fully loaded revolver. Mr. Turner was charged with the robbery of this bank in a two count federal indictment, 78 Cr. 884. Mr. Turner had a great deal of difficulty remembering specific items, especially those relevant to the alleged bank robberies, prior to his trial on those charges. Mr. Turner was examined by Dr. Naomi Goldstein and Dr. Stanley Portnow in connection with those charges to determine his competency to stand trial.

Dr. Goldstein diagnosed Mr. Turner as suffering from "[p]aranoid schizophrenia, chronic but without active psychosis at the present time. There may be a mild underlying organic mental syndrome, with impaired intellectual functioning and there are substantial personality difficulties with ·inadequate, hysterical, and sociopathic features." Nonetheless, Dr. Goldstein found Mr. Turner to be competent to stand trial.

Dr. Portnow diagnosed a "sociopathic personality disturbance, anti-social type, and malingering." Dr. Portnow found Mr. Turner to be competent to stand trial.

After reviewing the reports of Dr. Goldstein and ·Dr. Portnow and hearing their testimony, as well as the comments of Mr. Turner, Judge Lasker found Mr. Turner competent to stand trial.

Dr. Goldstein and Dr. Portnow also concluded that Mr. Turner was, at the time of the alleged bank robbery, responsible for his actions in that he did not lack substantial capacity to appreciate the wrongfulness of or to conform his conduct to the requirements of the law. Mr. Turner was also examined by Dr. Stanley H. Brodksy, regarding his capacity at the time of the alleged incident, who agreed with the conclusions of Dr. Goldstein and Dr. Portnow. Mr. Turner was convicted after a bench trial and sentenced, on July 6, 1979, to seven years in prison.

On November 30, 1979, Mr. Turner filed a *pro se* motion for a reduction of his sentence, pursuant to Rule 35 of the Federal Rules of Criminal Procedure. In response to apparent opposition by the Government to that motion, Mr. Turner wrote a letter to the Assistant United States Attorney on his case, with a copy to the Court, buttressing his request for a reduction of sentence. On August 28, 1980, Judge Lasker granted Mr. Turner's motion and reduced his sentence to five years. On May 3, 1982, Mr. Turner was released from prison.

On June 17, 1982, Mr. Turner was arrested by Port Authority Police Officer John Liegel and two other officers, and charged with second degree assault and third de-gree possession of a loaded weapon (a .22 caliber pistol). Mr. Turner was incarcerated at Riker's Island Detention Center for Men from June 18, 1982, until April 29, 1983, pending those charges. The pendency of those charges was prolonged in part by procedural and clerical errors encountered by the state in returning a valid indictment against Mr. Turner. Mr. Turner, apparently both *pro se* and through his various attorneys, was in constant contact with the state courts enforcing his rights.

Additionally, Mr. Turner filed, and actively pressed, a civil action in federal court, pursuant to 42 U.S.C. § 1983, against various defendants involved in his state proceeding—including the prosecutor, the various judges assigned to his case, the prison, certain hospitals from which he sought treatment, and some of his own attorneys.

Between September 15, 1982, when he filed his initial section 1983 complaint, and May 16, 1983, when his last letter to the judge handling his federal complaint was mailed, Mr. Turner filed at least twenty-eight *pro se* documents seeking to enforce his rights.

Meanwhile, the state court ordered a competency hearing to determine whether Mr. Turner was competent to stand trial on those charges. In connection with that evaluation, Mr. Turner was examined by two state psychiatrists, Dr. Myles S. Schneider on February 23, 1983, and Dr. Joseph Biangasso on February 28, 1983. Both doctors issued their reports on February 28th in which they diagnosed an atypical paranoid disorder and found Mr. Turner incompetent. On March 1, 1983, Judge Howard E. Bell declared Mr. Turner not competent to face the charges.

Mr. Turner, apparently, requested that yet another psychiatric evaluation be done (the materials submitted to the Court indicate that Mr. Turner claims to have requested that this evaluation be done by an independent psychiatrist). Dr. Robert H. Berger, another state psychiatrist, examined Mr. Turner on March 31, 1983, and

issued his report on April 18th. Dr. Berger found Mr. Turner incompetent to stand trial. On April 21, 1983, Mr. Turner was again declared incompetent.

On April 29, 1983, he was transferred to Kingsboro State Hospital for treatment. He apparently escaped from there on, or about, May 13, 1983.

Mr. Turner was arrested on the instant charges on July 7, 1983, in Atlantic City, where he was observed playing craps for at least two hours. As indicated above, defense counsel's inability to communicate meaningfully with Mr. Turner began shortly thereafter and these proceeding ensued.

### DISCUSSION

The law governing determinations of a defendant's competency to stand trial was changed in the Comprehensive Crime Control Act of 1984 ("the Act"), P.L. # 98–473. The Act took effect on October 12, 1984. Although the crimes Mr. Turner allegedly committed took place before that date, and, indeed, although all of the psychiatric evaluations and the hearing regarding Mr. Turner's competency were completed before that date, the Government urges the Court to apply the standards currently embodied in 18 U.S.C. § 4241, as amended by section 403 of the Act. The Court recognizes that the standard embodied in section 4241 is essentially the same as that theretofore embodied in 18 U.S.C. § 4244, as interpreted by *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). Nonetheless, the Court feels it is a wiser course to apply the standards embodied in section 4244, prior to amendments by the Act, and avoid any possible *ex post facto* arguments. The Court feels that this is the wiser course especially because the Act apparently shifted the burden of proof from the Government to the defendant (albeit that shift is only relevant in that rare case where the evidence is exactly evenly balanced because the level of proof required before and after the amendments remains the same—a preponderance of the evidence). *See also United States v. DiGilio*, 538 F.2d 972, 988 (3d Cir.1976), *cert.*

denied sub nom. *Lupo v. United States*, 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977) (arguing that placing burden of proof on defendant would be unconstitutional).

█ Section 4244 provides that a defendant is incompetent to stand trial if he is "presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly assist in his own defense." 18 U.S.C. § 4244 (1979). In applying that test, it is my job to determine "whether he has sufficient present *ability* to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. at 402, 80 S.Ct. at 789 (emphasis added).

█ The burden, as indicated above, is on the Government to show that the defendant is competent under those standards. *See Brown v. Warden, Great Meadow Correctional Facility*, 682 F.2d 348, 349 (2d Cir.), *cert. denied*, 459 U.S. 991, 103 S.Ct. 349, 74 L.Ed.2d 388 (1982); *DiGilio*, 538 F.2d at 987; *United States v. Zovluck*, 425 F.Supp. 719, 721 (S.D.N.Y. 1977). The Government must satisfy that burden with proof by a preponderance of the evidence. *See DiGilio*, 538 F.2d at 988; *Zovluck*, 425 F.Supp. at 721; *see also Brown*, 682 F.2d at 351 (preponderance standard is constitutional). It is appropriate, therefore, to review the evidence submitted to the Court.

### Psychiatric Reports

The Court has before it several psychiatric evaluations of Mr. Turner—all generated in relation to criminal proceedings against Mr. Turner—including the reports of the four examinations ordered in the instant case. The reports of earlier examinations are relevant to the instant proceeding because they afford the Court somewhat of a longitudinal view of Mr. Turner and also show certain patterns and/or in-

consistencies in his dealings with the examiners.

1. Report from Springfield Medical Center for Federal Prisoners.

Dr. Logan, after extended observations of Mr. Turner, found that Mr. Turner is competent. Dr. Logan noted that, upon admission to Springfield, "Mr. Turner seemed to present that he had a poor memory. However, *his lack of definite answers appeared to be totally voluntary.* Even when presented with simple yes or no questions Mr. Turner would refuse to give a straight answer." (Emphasis added.) At his second interview, Mr. Turner was able to advise Dr. Logan that he was charged with bank robbery.

Dr. Logan reported that Mr. Turner began complaining of auditory hallucinations after approximately one month on medication. These hallucinations included hearing singing that sounded like William Holden and seeing a group of six men, one of whom was John Liegel (the Port Authority Officer who had arrested him in 1982), who apparently threatened him and wanted him dead. Dr. Logan noted, however, that "[d]espite reporting these bizarre symptoms, Mr. Turner showed no looseness of associations or any symptoms of thought disorganization. His affect generally appeared calm and *he described these symptoms in a rehearsed manner.*" (Emphasis added.)

Moreover, Mr. Turner recalled that he had seen a psychiatrist in New York (presumably Dr. Portnow); recalled that he might have been arrested for bank robbery; and admitted that he had gone to New Jersey to gamble.

Mr. Turner remembered his union number and letter, but could not recall the date of his birth. Dr. Logan commented about this that "Mr. Turner's response in psychological interviews was described as markedly defensive in regard to self-disclosure.... His memory was quite selective. In addition, his responses were vague with a notable lack of straightforwardness."

Dr. Logan noted that Mr. Turner was an active participant in basketball and volleyball without apparent difficulty, but that he walked with a limp when he was on the ward. Dr. Logan also reported that Mr. Turner knew the purpose of the evaluation and the length of time he was expected to be at Springfield.

Dr. Logan noted that as the days progressed, Mr. Turner's memory problems diminished. He recalled much about his 1978 bank robbery proceedings before Judge Lasker, including the fact that his sentence had been reduced. He recalled a great deal about his state charges in 1982 —and especially about his claimed long-standing problems with John Liegel—including the fact that he had been found incompetent after being examined by three psychiatrists. Still, however, he refused to talk about the current charges. Mr. Turner did recall what others had told him about the alleged bank robberies and about his having shot someone. He also recalled that his attorney had shown him pictures of "himself," or someone who "looked like him," robbing a bank and shooting someone.

Dr. Logan recounted Mr. Turner's claim that he was taken from Kingsboro Hospital on May, 1983, to the Steinberger warehouse in Queens where he was given a "Frances Farmer Special"—needles in the neck and back. Mr. Turner claimed that he escaped from there and travelled to Atlantic City, Indianapolis, and back to Atlantic City. Dr. Logan noted that Mr. Turner became "somewhat defensive" when questioned about his ability to gamble despite his memory problems.

Dr. Logan's ultimate findings were as follows:

Mr. Turner has presented a variety of symptoms usually found in disparate psychiatric disorders. The first such symptom was memory loss, characterized initially by refusal to answer questions and numerous claims that he did not know information requested. Mr. Turner later modified this to giving fairly vague answers, and finally to being able to provide more specific details.

*There is no known type of mental disease or disorder that would produce the type of memory loss described by Mr. Turner.... The most reasonable explanation seems to be that Mr. Turner is malingering memory loss in order to avoid facing his current charges.*

. . . . .

Also during this period of evaluation, Mr. Turner described a number of psychiatric symptoms. These included seeing six men in his room, particularly John Liegel and a man named Figeroa who threatened him. Mr. Turner also claimed to hear singing and music in his ears. *These symptoms also do not seem credible. They were told in a very rehearsed way.* It was noted after the last interview with Mr. Turner, which lasted approximately an hour, he made no mention of the voices. He later approached a nurse in the hall and stated he needed to talk to the examiner urgently as he had forgotten to mention them. The symptoms described by Mr. Turner are usually those demonstrated by one who is floridly psychotic. *This, however, was inconsistent with the rest of Mr. Turner's behavior....* It is also inconsistent that Mr. Turner first experienced these symptoms over one month after being placed on antipsychotic medication *which ordinarily would counteract this phenomena* [sic] *in one who is truly psychotic.*

Other symptoms which would appear to be delusional would be Mr. Turner's repeated paranoid ideas regarding ... John Liegel. *This story is also suspicious....* Mr. Turner ... during this period of evaluation, has used this story particularly when he wishes to avoid talking about his current federal charges of bank robbery.

*Mr. Turner's accounts of the events at Sternberger Warehouse also do not appear characteristic of a true delusion.* There is a noticable [sic] lack of bizarreness in his recounting of these events. In addition, these events are used to explain his alleged current memory loss.

This memory loss is quite selective in that the only thing he is specifically unable to remember is the offense in question. Mr. Turner's description of this event is either a distortion of existing events or an outright fabrication. *The latter is strongly suspected.*

One persistent characteristic of Mr. Turner's past history and current behavior are some paranoid personality traits. These include guardedness and the expectation of trickery or harm from those in authority. In addition, there is the persistent questioning of the loyalties of others and an avoidance of accepting any blame when warranted. There has been an observed inability to relax and when confronted, Mr. Turner frequently counterattacks. Mr. Turner also shows some extremely compulsive personality features, particularly when reviewing his numerous motions to the court during 1982. To some degree, Mr. Turner's current paranoia is justified and may more represent legitimate fear concerning the seriousness of the charges facing him. An additional tendency is Mr. Turner's propensity for being helpless when questioned about decisions he would need to make in his current court case. This is a marked contradiction with Mr. Turner's behavior during 1982 when facing state charges. *Mr. Turner's ignorance of the function of court officers or legal proceedings contrast dramatically with* his letters to numerous judges, interactions with numerous lawyers, familiarity with motions for sentence reduction which he has filed pro se, motions for omnibus hearings, requests to testify before grand juries, and other legal points all *demonstrated by Mr. Turner in the recent past.*

When confronted, it is apparent that Mr. Turner has both an accurate as well as rational understanding of the proceedings against him. He has admitted that no harm has come to him in federal custody and describes the prior federal judge who sentenced him in 1979 in favorable terms. In his recent interactions with this examiner, Mr. Turner has also

shown an ability to cooperate with counsel in preparing a rational defense if he chooses to do so. When questioned about a plea, Mr. Turner adamantly denied that he would plead guilty. He stated he would plead not guilty, and when questioned further, stated he would plead not guilty by reason of insanity. It is quite likely however, in court proceedings Mr. Turner would try to focus the attention away from his offense by claiming that his mind was damaged by those interested in doing him harm in the New York area. This examiner does not believe this to be an irrational defense but *one that will be feigned* by Mr. Turner in an attempt to exercise a successful insanity defense.

DIAGNOSIS:   AXIS I:   1. No Mental Illness
                               2. Malingering
              AXIS II:  Personality disorder, antisocial and paranoid type.

(Emphasis added.)

The conclusions of Clinical Psychologist Christina E. Echols are similar. Ms. Echols commented about Mr. Turner's "minimal compliance with being evaluated," noting his aggressiveness toward her as the examiner and his defensiveness in responding vaguely or not at all. Ms. Echols noted that "Mr. Turner usually hesitated for several seconds before answering a question as if he was actively censoring material he wanted to present."

Commenting about Mr. Turner's memory problem, and its selectivity, Ms. Echols stated "[s]uch a selective memory raises doubts about Mr. Turner's memory impairment." Referring to Mr. Turner's filings in his section 1983 action, Ms. Echols notes "[t]hese motions would suggest that not only does Mr. Turner not suffer from gross memory impairment but that *his memory may be compulsively precise.*" (Emphasis added.)

Ms. Echols noted that Mr. Turner's responses were generally vague (especially regarding the alleged offense), and that his efforts during testing were generally "slow, careful and mildly compulsive." Mr. Turner's intelligence testing revealed that he is of estimated average intelligence; however, the test results might be inaccurate because many questions were left unanswered. Ms. Echols commented regarding this that "[i]t is difficult to ascertain whether his variable performance is due to his simply not knowing missed items and not wanting to guess or whether he deliberately skipped items in an effort to appear less intelligent than he actually is.... it may be Mr. Turner attempted to mask his likely above-average intelligence." Commenting, at another point, about Mr. Turner's responses to questions, Ms. Echols noted that "Mr. Turner's selective response pattern suggests he deleted items he is particularly defensive about and endorsed items which would emphasize his 'incompetence.'"

More significantly, Mr. Turner's "[r]esponses to simple open-ended questions about court proceedings indicate a flagrant attempt to look 'crazy.'" Ms. Echols noted that Mr. Turner's purported lack of understanding is of recent vintage, in marked contrast to his demonstrated knowledge of those proceedings and even to responses given a state psychiatrist in 1983. She noted that this contrast "suggest[s] malingered incompetence."

Ms. Echols concluded as follows:

Mr. Turner suffers from a long-standing Mixed Personality Disorder consisting of antisocial and paranoid features. Major paranoid features include expectation of trickery or harm, guardedness/secretiveness, project blame onto others, searching for confirmation of bias, becoming easily slighted/rejected, exaggerating difficulties, becoming ready to counterattack if he perceives threat, and inability to relax. Major antisocial features include a "dog-eat-dog" world view, "chip-on-the-shoulder" attitude, desire to dominate others, exploiting others, restlessness, and *persistent lying.* Evidence reviewed also indicates *Mr. Turner's memory loss is malingered.* That is, the selective and inconsistent nature of his memory suggest that he is faking. Motives for malingering

memory loss seem to be primarily marked antisocial, self-serving interests as well as marked suspiciousness about self-disclosure.

... Mr. Turner is competent to stand trial at this time. His evasive, vague self-reports and exceptionally poor performance with legal questions notwithstanding. Mr. Turner likely has a factual and rational understanding of the charge against him. Further, background materials suggest Mr. Turner has sufficient capacity to assist his attorney in preparing his defense. The difficulty that may arise ... is Mr. Turner's propensity to become "disoriented and confused" with legal counsel. However, these difficulties are *entirely under Mr. Turner's control.* His capacity to communicate effectively is *volitional* and not due to inability.

(Emphasis added.)

### 2. Reports of Dr. Stanley Portnow

Dr. Portnow examined Mr. Turner in connection with his earlier armed robbery charges. At that time, Dr. Portnow commented that Mr. Turner "is an extremely hostile and uncooperative man." Dr. Portnow noted that Mr. Turner's performance in answering questions was "uneven," and that his ability to make arithmetic calculations was inconsistent. Dr. Portnow also commented on Mr. Turner's "selective" memory gaps, finding that they "indicate neither retrograde, antegrade, recent or [sic] remote memory defect." Dr. Portnow concluded that "the primary diagnoses in this case are sociopathic personality disturbance, anti-social type, *and malingering.*"

Dr. Portnow examined Mr. Turner again, this time on July 29, 1983, in connection with the pending charges. Dr. Portnow noted that Mr. Turner's "affect was inappropriate to the situation. It was clear from the outset that Mr. Turner was intent on impressing me with the degree of his illness." This time, Mr. Turner was unable to do any mathematical calculations—including two that he had been able to do when Dr. Portnow last examined him in 1979. Mr. Turner was also unable to recite the months of the year, in sequence: he listed them as "January, February, May, June, Christmas." With respect to questions posed regarding court proceedings, Mr. Turner claimed not to have an attorney and "flatly refused to answer questions concerning the function of a judge, prosecutor, or jury."

Dr. Portnow commented that "[i]t is difficult to ferret out what is illness and what is conscious simulation (malingering) in the examination." He concluded as follows:

My professional opinion in this regard is the same as it was in 1979. Mr. Turner is first and dopemost [sic] *malingering.* He may have a mental illness obscured by the malingering, but *it is not the mental illness which is controlling his present psychological status but rather his conscious simulation.* The diagnosis is clearly one of Antisocial Personality Disorder.

### 3. Reports of Dr. Naomi Goldstein

Dr. Goldstein, like Dr. Portnow, examined Mr. Turner in 1979 in connection with his earlier bank robbery charges. She noted that Mr. Turner "has been extremely difficult to interview although superficially cooperative, and the quality of his responses have been perplexing, making it necessary to check other types of records and to have him tested intensively." Based on this extensive review, Dr. Goldstein diagnosed "[p]aranoid schizophrenia, chronic but without active psychosis at the present time. There may be a mild underlying organic mental syndrome, with impaired intellectual functioning and there are substantial personality difficulties with adequate, hysterical, and sociopathic features."

One of the reports Dr. Goldstein relied upon was issued by Dr. Timothy P. Barth. In that report, Dr. Barth indicated that "[a]t times I feel that Mr. Turner was *blatantly malingering.*" Dr. Goldstein incorporated that intimation into her report and concurred to some extent. She indicated that the "selectivity and poor quality

of some of the responses, however, are felt to reflect *volitional elements* as well as unconscious factors, a subtle synthesis of underlying difficulty and self-serving behavior over which Mr. Turner has some control." Mr. Turner was able to define the meaning of bank robbery, as well as the functions of judge, jury, and lawyer. Dr. Goldstein found Mr. Turner competent to stand trial.

As discussed above, Dr. Goldstein attempted to interview Mr. Turner in connection with these charges, but he refused to see her. Nonetheless, Dr. Goldstein reported to the Court that her review of Mr. Turner's records and a conversation with Metropolitan Correction Center psychiatrist Dr. Herson had revealed nothing that would preclude a finding of competency.

4. Reports of Dr. Robert H. Berger

Dr. Berger interviewed Mr. Turner in 1983 in connection with then pending state charges. At that time, Dr. Berger, too, noted that Mr. Turner was "superficially cooperative" but "extremely difficult to interview." At that time, Mr. Turner was able to perform basic arithmetic calculations, denied auditory hallucinations, and had "an adequate understanding and some appreciation of the charges against him and general legal procedure." Nonetheless, Dr. Berger, relying almost exclusively on his interview with Mr. Turner, felt that he was unable to adequately assist counsel in his defense.

Dr. Berger examined Mr. Turner again in connection with the pending charges. This time, Dr. Berger was provided with an array of collateral materials regarding Mr. Turner's history and the charges pending against him. Dr. Berger found Mr. Turner to be "minimally cooperative" during the interview. Commenting about the vague and evasive manner in which Mr. Turner answered questions, Dr. Berger noted that "[t]here was a slowness to respond which appeared to be a moment of assessing the purpose and importance of the question as well as time to formulate an uninformative response ... statements which were informative, were self-serving and were made to either emphasize symptoms of ill-

ness, or to directly confuse the examiner." Once again, however, Mr. Turner was able to perform simple arithmetic functions. When asked specifically about the charges pending against him, Mr. Turner said he was charged with "a lot of things ... I can't remember them all." Mr. Turner, however, did not remember the bank robbery charges. Moreover, Mr. Turner did not answer correctly any questions regarding general court proceedings, or the actors involved (judge, jury, prosecutor, or defense counsel). Rather, he indicated that the job of the prosecutor was "[t]o be a doctor, I guess." Mr. Turner did, apparently, slip a little, however, when he responded "No, I don't have nobody to help" to a question whether he had an attorney.

Dr. Berger concluded that Mr. Turner has "No major mental disorder," but rather a "Personality Disorder with mixed features—Paranoid and Antisocial." Dr. Berger's diagnosis and opinion were as follows:

> Mr. Turner may have experienced acute, transient, decompensations of his Personality Disorder with a worsening of his paranoia, these tend to be short lived. None is present at this time.
>
> .    .    .    .    .
>
> James Turner does not demonstrate a consistent complex of symptoms which could be recognized as any *legitimate* psychiatric or neurological syndrome or disease. It is my opinion that he is exaggerating and ellaborating [sic] and simulating psychiatric and neurological symptoms and deficits in an attempt to be seen as ill and to thereby avoid facing the charges against him. In face of the absence of findings of a mental disease or defect which would impair his capacity to know, appreciate or understand the charges and the proceedings against him, or to effect [sic] his ability to properly assist in defense, it must be deduced that *he is consciously and volitionally not cooperating.*

(Emphasis added.)

5. Report of Dr. Stanley H. Brodsky

Dr. Brodsky examined Mr. Turner in 1979 to determine his sanity at the time of

the bank robbery alleged in the earlier federal charges. At that time, Mr. Turner was questioned about his participation in the alleged bank robberies. He said he was unable to recall; however, he did recall being shown pictures of someone who "looks like me" robbing a bank. He also claimed to have been given shots in the back of his head at Robert Long Hospital in Indiana after his injury at the State Farm. Dr. Brodsky's diagnosis was "Mixed Personality Disorder with Paranoid and Antisocial features" and "Malingering." Dr. Brodsky, too, opined that Mr. Turner's "memory lapses are ... attempts by [him] to deny his involvement in the alleged crime of bank robbery."

### 6. Report of Dr. Joseph Biangasso

Dr. Biangasso examined Mr. Turner in 1983 in connection with pending state charges. At that time, Mr. Turner displayed an adequate understanding of general court proceedings, and knew the charges against him. Nonetheless, apparently due to Mr. Turner's "volatility," Dr. Biangasso concluded that Mr. Turner was unable to assist in his own defense, and found him incompetent.

### 7. Report of Dr. Myles S. Schneider

Dr. Schneider also examined Mr. Turner in 1983 in connection with the state charges. His findings are similar to those of Dr. Biangasso. Mr. Turner responded to questions regarding the actual charges, and court proceedings generally, with answers demonstrating an adequate understanding thereof. Nonetheless, Dr. Schneider, too, found Mr. Turner unable to cooperate with counsel and incompetent to proceed.

*Other Evidence*

### 1. Grand Jury Material

The Government provided the Court certain evidence that was presented to the grand jury in this case. Defense counsel has also seen this material. In order to preserve, to the extent possible, the secrecy of those proceedings, the Court will not summarize that evidence here.

### 2. Mr. Turner's Rule 35 Motion

In November, 1979, Mr. Turner submitted a *pro se* motion for a reduction of the sentence imposed by Judge Lasker after his conviction for armed bank robbery. Although rife with misspellings, this motion demonstrates an eloquence and articulateness seen in few such motions—even (if not especially) those drafted by attorneys.

In those papers, Mr. Turner pleads for mercy. At one point he says "I beg you to have mercy upon me ... to be able to provide for my mother she dont [sic] have long to live.... I want to be able to do the right things in life like every other decent human being." At another point, he urges "I am Thirty Four, and I realize that if you dont [sic] grant me leniency I want [sic] be any good to anyone I love. Please let me prove to my loved ones and to you."

Mr. Turner also speaks of seeking help for his mental problems. He advised the Court that proper counselling was not available to him in prison and says he would go to his own doctors if given the chance.

Additionally, Mr. Turner responded to the Government's apparent opposition to his Rule 35 motion. He sent this response directly to the Assistant United States Attorney on the case, with a copy to the Court. In that letter he buttresses his arguments for a reduction of his sentence. For example, to further show his remorse and rehabilitation he states as follows:

> You keep saying I robbed 17 banks. I dont [sic] know what you keep saying this for. If I can [sic] remember these things I would have told you. I am sorry what I did, what more do you want. Why do you try to make everything look like I am some kind of animal. Do you think I am going to rob banks again. I am sorry about [sic] what I did. And I will never do it again.

### 3. Mr. Turner's civil rights action.

While incarcerated at Riker's Island pending state charges in the latter part of 1982 and early part of 1983, Mr. Turner filed a *pro se* civil rights complaint in this

Court. In that suit—initially and through at least two amended complaints—he named almost all of the participants in his pending state charges as conspirators to deprive him of his rights. He filed numerous responses and motions—one for preliminary injunctive relief. The Court has reviewed all of these carefully, and finds them to be relevant because they are demonstrative of Mr. Turner's capacity and comprehension at a point near in time to the alleged offenses and to Mr. Turner's arrest and subsequent behavior.

4. Mr. Turner's gambling in Atlantic City.

Mr. Turner was observed playing craps at the Golden Nugget Casino in Atlantic City for nearly two hours prior to his arrest on July 7, 1983. During that time, he moved back and forth among a few tables, placing bets of $25–$100, and apparently playing well.

Five casino employees who came in contact with Mr. Turner during this period stated that they had no specific recollection of Mr. Turner. Each, however, claimed that had Mr. Turner been doing anything out of the ordinary, he/she would have remembered.

Two casino employees did specifically recall Mr. Turner. One, who considered craps "about the most difficult game," observed that Mr. Turner behaved rationally, played well, knew exactly how to place and call bets, and took odds. The other noted that Mr. Turner acted like a regular player. He recalled asking Mr. Turner his name, to which Mr. Turner asked "Why?" When the employee explained that the casino rated the better players, Mr. Turner said his name was "Carl Roberts."

5. Photographs of the alleged crimes.

The Court has reviewed a series of photographs showing a man, allegedly Mr. Turner, robbing the First Nationwide Savings and Loan, and during the course of that robbery, first, frisking and, then shooting, an unarmed bank guard. These photographs are not viewed with an eye to Mr. Turner's guilt, or as indicative of the severity of the offense for neither of those is currently before this Court. Rather, these are received because of the manner in which the crime they depict are committed. The photos depict what was apparently a planned, dispassionate offense. Assuming it was Mr. Turner who committed this offense, at a point in time near to his arrest and to the apparent adoption of his current behavior, it is relevant to his current ability to reason, plan his defense, and assist counsel.

6. Mr. Turner's testimony.

Mr. Turner testified at the competency hearing held on August 28, 1984. Many of his responses were bizarre and non-responsive, to say the least.

The following interchanges are demonstrative of the more unusual of Mr. Turner's responses:

Q. Mr. Turner, have you ever been arrested before; that is, before you were arrested in this charge were you ever arrested?

A. Yes. I was arrested.

Q. And do you remember when that was? Do you remember what happened in those cases where you were arrested before?

A. Bat wings in a can.

Q. Would you repeat that, please, if you understand that questions?

A. There was only two cans.

Q. Only two what?

A. Cans.

Q. Two cans of what?

A. With wings in it.

Q. Where?

A. In the can.

Q. Let me repeat my question:
Do you remember what happened on the prior occasions when you were arrested, what the results of those cases were?

A. There was only three of them.

Q. Three cases?

A. It was in the can.

Q. What was in the can?

A. The wings.

Q. What kind of wings, Mr. Turner?

A. Bat wings.

**1308**

Q. Where did you see bat wings?

A. In the can.

Q. Where was the can?

A. In the middle of the castle.

Q. And where was the castle?

A. You've seen it.

Q. But where is it?

A. You've seen it.

Q. Well, the Judge and other people don't know about it. Can you tell us where the castle is?

A. John Lizer has it.

Q. And who is John Lizer?

A. He's at the World Trade Center.

Q. And who is he?

A. You know him. Everybody know him.

Q. Can you tell us who he is?

A. He's the man who wanted to kill me.

Q. He wants to kill you?

A. Yes. He wants to kill me.

Q. Why do you believe he wants to kill you?

A. He's been trying to kill me for a long time.

Q. How long a time has he wanted to kill you?

A. A long time.

Q. What is it he has done that leads you to believe he wants to kill you?

A. He wants to kill me.

Q. How do you know that?

A. Everybody knows about it.

Q. What if anything has he done that leads you to believe that he wishes to kill you?

A. They know about it. Everybody knows about it.

[and, at another point]

Q. What was the last place you lived in?

A. The warehouse.

. . . . .

Q. Mr. Turner, the last question I asked you was, where was the place that you lived, and you said it was in a warehouse. Do you know where that was?

A. Stern—I think.

Q. Where?

A. That was where they took me, the Steinberger warehouse.

Q. You are saying that is where they took you. Where were you living before?

A. Steinberger warehouse.

Q. Where did you live before that?

A. The Steinberger warehouse in Queens, They tried to kill me in the Steinberger warehouse, in the State. They took me there and tried to kill me. You know about it, and other people know about it. They didn't like what I was doing. They didn't like what I was doing. Everybody knew about it.

Most of Mr. Turner's testimony, however, was not this bizarre. Nonetheless, much of Mr. Turner's testimony was vague and inresponsive. As an example, Mr. Turner's testimony regarding his date and place of birth is noteworthy.

Q. Mr. Turner, how old are you?

A. Thirty-nine.

Q. And can you tell us when your birthday is?

A. February.

Q. Can you tell us in what year you were born?

A. February.

. . . . .

Q. Mr. Turner, February has 28 days. Do you recall which day in February you were born? Can you tell us which day in February you were born?

A. February.

Q. Do you recall what year you were born. Mr. Turner, do you understand my question when I ask you what year you were born?

A. February. February.

Q. Do you know what year it is now?

A. 1984.

Q. All right. Now, do you remember what year it was that you were born?

A. February.

Q. Well, is February a year or is February a month?

A. It's February.

Q. Mr. Turner, do you know what City you were born in?

A. Indiana.

Q. Where in Indiana were you born?

A. Indianapolis.

Mr. Turner's testimony regarding the specific charges against him, and the nature of those charges, was particularly vague.

Q. [By Defense Counsel] Well, can you tell us more specifically what things you believe they have accused you of doing?

A. That I hurt somebody.

Q. What is your understanding of how you hurt somebody?

A. That I hurt somebody, I tried to kill somebody. They say I tried to kill somebody.

Q. Do you have any further understanding of what they say you did.

A. They said I tried to hurt somebody in a bar full of people. They say I tried to kill a man.

Q. Did you also know you are accused of robbing a bank?

A. I know that, too.

Q. Do you know what a bank is?

A. Yes.

Q. Can you tell us, what is a bank?

A. A place that holds money.

Q. Do you know what it is to rob a bank?

A. I guess so.

Q. What does that mean: to rob a bank?

A. To rob a bank.

Q. Do you know when it is that you are supposed to have robbed a bank?

A. No.

Q. Do you remember the police taking you into custody in connection with the charges that are now filed against you?

A. No.

Q. Mr. Turner, do you recall ever being in the First National Federal Savings & Loan Association bank?

A. No.

Q. Do you recall ever being in a bank called the First National Savings & Loan Association?

A. No. No.

Q. [By the prosecutor] Mr. Turner, do you remember being in a bank and shooting somebody in a bank?

A. Many people come and told me that I shot a man named Bryan Kirby. People have shown me in the newspaper that I shot a man named Brian Kirby.

Q. People at MCC?

A. When they grabbed me, they told me that. The name was Bryan Kirby. They told me I shot him, and they told me he lost his stomach. That's what they told me all the time.

Q. Did you in fact shoot a man in the stomach?

A. I don't know. I don't remember shooting nobody.

Q. Do you remember robbing some banks?

A. They said I robbed some banks.

Q. No. I am asking what you remember.

A. I don't know.

Q. Why don't you know?

A. I don't know. If I robbed a bank, I would say. I don't know. People ask me the same question. I don't know. I don't know. I'm telling you the truth. I don't know.

When Mr. Turner was shown the pictures of someone, allegedly himself, robbing a bank and shooting the guard, his answers were direct.

Q. [By defense counsel] Now, do you recognize anybody who appears in those photographs?

A. No.

Q. Do you want to look at them again?

A. Is that supposed to be me?

Q. I am asking you if you recognize anyone in the photographs?

A. No. That's supposed to be me?

Q. Well, do you recognize anyone there as looking like you?

A. No.

Q. [By the prosecutor] Isn't that you holding the gun?

A. No. No.

Q. Now referring to Exhibit No. 32B in that series, do you see the man that the gun is pointing at?

A. Yes.

Q. Did you ever see that man before?

A. No.

A. This is supposed to be me?

A. This is where I shot? They say I shot a man. That is what I am trying to figure out. I don't shoot nobody. I don't hurt nobody.

Mr. Turner's responses to questions concerning general court proceedings were quite vague.

Q. [By defense counsel] Do you know what it is to be arrested?

A. When you're grabbed by the police.

Q. Mr. Turner, do you know what a trial is?

A. I've seen one.

Q. You say you have seen one?

A. I've seen one.

Q. Can you tell us what your understanding is of what a trial is?

A. It's people involved, I think.

Q. Do you know what the purpose of trial is?

A. It's people.

Q. And what do the people do?

A. They do different things.

Q. What are the different things that the people do?

A. I don't know.

Q. Do you know that there is a judge in the trial?

A. Yes.

Q. Do you know what the Judge does at the trial?

A. Take care of things.

Q. And do you know that there is a prosecutor at the trial?

A. Take care of things.

Q. And do you know that there is a prosecutor at the trial?

A. Take care of things.

Q. What does the prosecutor do?

A. Take care of things.

Q. What kind of things does the prosecutor take care of?

A. Like the judge.

Q. Do you know there is a defendant at the trial?

A. Yes.

Q. Who is the defendant?

A. Take care of things, too.

Q. What kind of things does the defendant take care of?

A. Take care of things, like the judge.

Q. Do you know what the lawyers do at the trial?

A. Take care of things, too.

Q. What is the purpose of the trial?

A. Take care of things.

Q. What kind of things?

A. Take care of things.

Q. Can you tell us, what kinds of things do they take care of?

A. I don't know.

Q. [By the prosecutor] Mr. Turner, do you know who I am in this case?

A. No.

Q. Do you know what the prosecutor does in a case?

A. Sometimes.

Mr. Turner did appear to recall the civil rights action he had filed in 1982. Some of his responses on this, too, however, were a bit spotty.

Q. [By defense counsel] Mr. Turner, you talked about a case before Judge Sand. Who brought that case before Judge Sand?

Mr. Turner, did you bring a case before Judge Sand?

A. I had a case before Judge Sand.

Q. And did you have a lawyer in that case?

A. No.

Q. Did you act as your own lawyer?

A. I think so.

Q. And did you file papers in that case?

A. A whole lot of things happened.

Q. Well, do you remember that papers were filed in that case?

A. There was a paper in the case.

Q. And who prepared the papers?

A. I did.

Q. And did anybody help you prepare the papers?

A. Sometimes.

Q. And who was that?

A. I don't know who the people were.

Q. Were those people in jail with you?

A. I don't know. A lot of people.

Q. Who wrote out the papers that were sent to Judge Sand?

A. I did.

Q. How did you know what to wrote on those papers?

A. People helped me.

THE COURT: What did you write in those papers, Mr. Turner?

THE WITNESS: They tried to mess me up. They were trying to mess me up, and they messed my back up.

Q. What happened with the case that was before Judge Sand?

A. I don't know.

Q. Did you ever go to court?

A. No.

### Analysis of the Evidence

Having heard Mr. Turner testify at the competency hearing, and having received that testimony today, the Court understands why defense counsel feels that he is unable to get any assistance from Mr. Turner in the preparation of this defense. It cannot be gainsaid that such vague, evasive, unresponsive answers, sometimes tantamount to gibberish, are of little assistance to counsel. Likewise, the Court has no doubt that Mr. Turner does, indeed, suffer from severe mental problems—seemingly typified by anxiety and paranoia. Nonetheless, while the Court does not pretend to comprehend all of the ratiocinations of Mr. Turner's mind, the Court does find, and the evidence overwhelmingly supports this conclusion, that Mr. Turner's professed inability to communicate intelligibly and assist counsel is his own choice, i.e., it is volitional.

■ First, and foremost, the Court is persuaded by the unanimity of opinion among the psychiatrists and psychologist who examined Mr. Turner that he is malingering. To be sure, medical evidence, such as this is not conclusive, but merely advisory for the Court. *See United States v. Blohm*, 579 F.Supp. 495, 500 (S.D.N.Y. 1983); *United States v. Zovluck*, 425 F.Supp. 719 (S.D.N.Y.1977). Nonetheless, those opinions are entitled to substantial weight. The reports of Dr. Logan and Ms. Echols, in particular, are significant because they were prepared after extended observations and interviews of Mr. Turner. Mr. Turner's ability to relate well with fellow inmates in the general population was observed and noted. Additionally, I have observed Mr. Turner on a number of occasions. Based on the observations listed in the reports, and on my observations, I find that the psychiatric reports are valid with respect to the conclusion that Mr. Turner is malingering.

In *Zovluck*, several common indicia of malingering were enumerated. Those were listed as the following:

dramatic acting, special familiarity with textbooks of psychiatry, unusually superior intelligence, professional criminal background, findings incompatible with mental illness, frequent legal manipulation in the past, notoriety, unusually proficient conning ability, impostering, impersonating, etc.

425 F.Supp. at 724. Mr. Turner exhibits several of these indicia. Dramatic acting can be noted in his habit of rubbing the back of his neck, which he did quite frequently while testifying, while complaining of needles and such, and in his claimed

inability to breathe at times. It was also noted at Springfield that, although Mr. Turner walked around the complex with a limp, he was able to play basketball and volleyball without any difficulty. (*See also* Grand Jury Testimony at pp. 22–23, 11s. 23–5.) Moreover, dramatic acting can be seen in Mr. Turner's professed hallucinations. These were appropriately referred to as "rehearsed." In particular, the Court finds that Mr. Turner's claimed hallucinations regarding the Sternberger warehouse are feigned, especially in light of the similar story he relayed to Dr. Brodsky regarding shots given to him at the Robert Long Hospital. Mr. Turner has also engaged in frequent legal manipulations. This can be seen clearly in the poignant pleas for mercy in his *pro se* Rule 35 motion and in his *pro se* civil rights claims. (*See also* Grand Jury testimony at p. 14, 11. 7–19.) His lengthy criminal record needs no further discussion; certainly he qualifies as a professional criminal. Although Mr. Turner has not demonstrated a superior intellect, his poor performance at intelligence testing was considered suspicious by some of the doctors who examined him. Indeed, Ms. Echols felt Mr. Turner is likely to be of "above-average intelligence." Moreover, Mr. Turner has demonstrated an unusually proficient conning ability and, on at least one occasion has assumed an alias—he identified himself as "Carl Roberts" to a floorperson in the Golden Nugget. Finally, many of the doctors who have examined him have indicated that Mr. Turner acts and performs in a manner incompatible with mental illness.

The Grand Jury material corroborates this finding that Mr. Turner is malingering. It would appear that Mr. Turner would prefer to be found incompetent, rather than face these very serious charges. He has been found incompetent at least once in the past, although feigned incompetence then is strongly suspected (*see* Grand Jury Material, p. 14, 11. 7–19), and was able to escape from confinement in a mental institution. Moreover, Mr. Turner's conduct once he was found incompetent in the prior state proceedings corroborates the evidence before the Grand Jury to a significant extent.

Mr. Turner's answers and conduct at the hearing further supports this finding. The Court was particularly intrigued by Mr. Turner's responses regarding his date of birth. He recalled that he was born in February. When asked, however, what year he was born, he responded "February." When asked further which day he was born, he responded "February." Mr. Turner's response to these questions was not "I don't know." Rather, it was obvious that he was stubbornly trying to convince those present that he did not know the differences among months, days, and years. He did, however, know that it was then 1984. His orientation to year belied his seeming confusion over the nature of February. He also recalled the city and state of his birth. His ability to recall this belied any memory lapse for the details of his birth. Juxtaposed, as these questions were at the hearing, Mr. Turner's responses unmask his volitional attempts to look crazy before this Court.

On the ultimate issues before the Court, I find as follows. Mr. Turner does have a rational understanding of the charges against him. The Court bases this, in large part, on the belief that Mr. Turner's selective memory loss regarding the alleged crimes is malingered. Mr. Turner displayed the same selective memory loss prior to his 1979 trial for armed bank robbery. On the other hand, in his *pro se* papers filed in connection with his civil rights complaints, Mr. Turner displays a punctilious recall for facts (names, dates, events, telephone numbers, etc.). Those papers were written and filed some three to four years after his earlier charges for bank robbery, and as recently as two months before his memory loss recurred upon arrest for these charges. It strains credulity to suggest that Mr. Turner's roller-coaster-like memory is anything but volitional.

Furthermore, Mr. Turner has slipped on a few occasions and demonstrated some familiarity with the pending charges. During clinical interviews with Dr. Logan at

Springfield, Mr. Turner recalled that "others said" he had robbed banks and shot someone. He recalled that his attorney had shown him pictures of himself robbing a bank and shooting someone—or at least of someone who looked like him (see also his similar identification in 1979 before Dr. Brodsky, but contrast his testimony at the hearing, Tr. 16, 36). He recalled the court proceedings that had occurred thus far in this case. At the hearing, although giving answers that were vague and evasive, and tending to show a lack of familiarity with the pending charges, he again slipped. Unsolicited, Mr. Turner recalled the name of the individual he allegedly shot. He claimed, however, that he had been told that by other people. In addition, when he was reviewing the photographs, Mr. Turner remarked at one point, "[t]his is where I shot? They say I shot a man." I find that Mr. Turner has an adequate, and rational understanding of the charges against him.

Furthermore, I find that Mr. Turner has a rational and adequate understanding of general court proceedings. He has had substantial contact with the judicial system over the years—as a criminal defendant, as a movant, and as a civil plaintiff. His responses to questions posed by all the examiners over the years have indicated an adequate understanding of the proceedings themselves. He told Dr. Goldstein in 1979, for example, that a jury is "when they get people in the box ... they listen ... decide if you're right or wrong." He told Dr. Portnow in 1979, for example, that a district attorney's job is "to prosecute me" and the defense counsel's job is "to help me." He answered all of Dr. Biangasso's questions regarding his knowledge of court proceeding with accurate, informative responses. He did the same with Dr. Schneider's questions, and, apparently, with Dr. Berger's questions in 1983. He recalled his court appearances and described court functionaries to Dr. Logan.

He did not answer these questions adequately for three examiners in 1983 and 1984, Dr. Berger, Dr. Portnow, and Ms. Echols. Each, however, felt that he was malingering and discounted these responses. Indeed, with one, Dr. Berger, Mr. Turner slipped for a moment and demonstrated knowledge that a defense attorney's job is to help him.

Moreover, the Court is quite impressed with Mr. Turner's personal legal work. The *pro se* Rule 35 motion he filed in 1979, though replete with misspellings and grammatical errors, is eloquent and discusses all imaginable salient factors for consideration of such a motion. Furthermore, his letter response to the Government's opposition to that motion was quite cogent. The papers he filed in his civil suit are equally impressive. Mr. Turner admits that he penned these himself. At first, he even admitted that he did all the preparation of them, but when asked whether he had received any help he said "sometimes." (*But see* Grand Jury materials pp. 9–10, 21.) Even if Mr. Turner did receive help in preparing these papers, his level of input—as indicated by the meticulous factual content—was substantial and indicative of one competent to stand trial. *See United States v. Zovluck*, 425 F.Supp. at 725 (finding number 2).

Finally, I find that Mr. Turner is *able* to assist counsel. If he chooses not to assist counsel, it will undoubtedly redound to his own detriment. That, of course, is his own choice. He is perfectly capable of assisting counsel. Moreover, he could not possibly find more able counsel. It is, therefore, clearly in his own interest to assist counsel.

The Court does recognize that this is a difficult case, and certain provision for that will be necessary. I trust the Government will be helpful with discovery. *Cf. United States v. Wilson*, 263 F.Supp. 528, 534 (D.D.C.1966) (encouraging full utilization of discovery to assist defense counsel in overcoming defendant's amnesia).

■ Accordingly, the Court finds that the Government has more than carried its burden of proof, and the motion to find Mr. Turner incompetent to stand trial is denied. Mr. Turner is hereby found competent to stand trial.

SO ORDERED.